IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,267

LUKE GANNON, by his next friends and guardians, *et al.*,
*Appellees*,

V.

STATE OF KANSAS; RON ESTES, in his individual capacity and in his official capacity as Kansas State Treasurer; and JIM CLARK, in his official capacity as Secretary of the Kansas Department of Administration,
*Appellants.*

SYLLABUS BY THE COURT

1.

Under the facts of the case, the district court panel unnecessarily joined certain state officials in their official and personal capacities under K.S.A. 2015 Supp. 60-219(a)(1)(A) because complete relief can be accorded among the existing parties in the state officials' absence.

2.

It is axiomatic that on remand for further proceedings after a decision by an appellate court, the district court must proceed in accordance with the appellate court mandate. The district court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces, and it has no authority to consider matters outside the mandate.

3.

To determine compliance with the equity requirement in Article 6, the education article of the Kansas Constitution, Kansas courts do not require adherence to precise

1

standards of equality. Instead, school districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort.

4.

When it is apparent from the record the district court was aware of the proper legal test to be applied, an appellate court presumes the district court applied the proper test.

5.

Under the facts of this case, the district court panel properly applied the equity test adopted in *Gannon v. State*, 298 Kan. 1107, 319 P.3d 1196 (2014).

6.

Under the facts of this case, the district court panel correctly held the State has not carried its burden to show it has cured capital outlay's unconstitutional inequities that were affirmed to exist in *Gannon v. State*, 298 Kan. 1107, 319 P.3d 1196 (2014).

7.

Under the facts of this case, the district court panel correctly held the State has not carried its burden to show it has cured supplemental general state aid's unconstitutional inequities that were affirmed to exist in *Gannon v. State*, 298 Kan. 1107, 319 P.3d 1196 (2014).

8.

The Kansas Constitution receives its force from the express will of the people and serves as the supreme and paramount law of the state.

9.

Through Article 6 of their constitution, the people of Kansas expressly assigned duties to the legislature that both empower and obligate it to make suitable provision for finance of the educational interests of the state. Under this article, the legislature must perform its duties in compliance with the requirements the people have established.

10.

Determining whether an act of the legislature is invalid under the people's constitution is solely the duty of the judiciary. The judiciary is not at liberty to surrender, ignore, or waive this sworn duty.

11.

The judiciary has the power to order remedies to enforce its holdings.

Appeal from Shawnee District Court; FRANKLIN R. THEIS, ROBERT J. FLEMING, JACK L. BURR, judges. Opinion filed February 11, 2016. Affirmed in part and reversed in part.

*Stephen Phillips*, assistant attorney general, was on the brief for appellant Ron Estes.

*Daniel J. Carroll* and *Philip R. Michael*, of the Kansas Department of Administration, and *Tim Keck* and *Brant Laue*, of the Governor's office, were on the briefs for appellant Jim Clark.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, *M.J. Willoughby*, assistant attorney general, *Dwight Carswell*, assistant solicitor general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant State of Kansas; *Arthur S. Chalmers*, of Hite, Fanning & Honeyman, LLP, of Wichita, argued the cause, and *Gaye B. Tibbets*, *Jerry D. Hawkins*, and *Rachel E. Lomas*, of the same firm, were with him on the briefs for appellant State of Kansas.

*Alan L. Rupe*, of Lewis Brisbois Bisgaard & Smith LLP, of Wichita, argued the cause, and *Jessica L. Skladzien* and *Mark A. Kanaga*, of the same firm, and *John S. Robb*, of Somers, Robb & Robb, of Newton, were with him on the briefs for appellees.

*Tristan L. Duncan* and *Zach Chaffee-McClure*, of Shook, Hardy & Bacon L.L.P., of Kansas City, Missouri, were on the brief for *amicus curiae* Shawnee Mission Unified School District No. 512.

*Per Curiam*:  This is a school finance case concerning Article 6 of the Kansas Constitution, which imposes a duty on the legislature to "make suitable provision for finance of the educational interests of the state." Kan. Const. art. 6, § 6(b). In *Gannon v. State*, 298 Kan. 1107, 1163, 319 P.3d 1196 (2014) (*Gannon I*), we confirmed that Article 6 contains both adequacy and equity requirements. It necessitates that the legislature provide enough funds to ensure public school students receive a constitutionally adequate education and that the funds' distribution does not result in unreasonable wealth-based disparities among districts.

On remand from *Gannon I*, a three-judge district court panel made various rulings, from which the State of Kansas now appeals. Paramount among them is a holding the State failed to comply with our directive on equity articulated in that March 7, 2014, opinion. There we affirmed the panel's 2013 holding that the State had failed to meet the constitutional equity requirement when it eliminated capital outlay state aid payments and prorated supplemental general state aid payments—to which school districts were statutorily entitled—beginning in fiscal year 2010. 298 Kan. at 1175, 1182. And we ordered the panel to ensure these inequities were cured on remand after it applied our more clearly defined equity standard. 298 Kan. at 1198-99. Also before the panel on remand were issues related to the adequacy component of Article 6. See 298 Kan. at 1172, 1199-1200. Those holdings are not before the court at this time.

4

On remand, and based upon early enactments and the State's representations concerning its commitment to resolve the inequities outlined by this court, the panel initially determined that the State had complied with *Gannon I*'s equity directive during the ongoing 2014 legislative session by fully funding the capital outlay state aid and supplemental general state aid formulas as then existing. But the panel retracted its determination after the 2015 legislature amended those funding formulas for fiscal year 2015 (that had begun July 1, 2014) and repealed the existing school funding system, *i.e.*, the School District Finance and Quality Performance Act (SDFQPA)—including the 2015 revised aid formulas—for fiscal years 2016 (beginning July 1, 2015) and 2017 (beginning July 1, 2016).

For fiscal year 2015, the 2015 legislature's amended aid formulas resulted in approximately $54 million of reductions to these statutory entitlements. With the repeal of the amended formulas for fiscal years 2016 and 2017, funding for both types of aid simply was frozen at the reduced 2015 amounts. As a result, the panel held the State was no longer in compliance with the *Gannon I* directive. It ordered relief that, among other things, effectively restored this funding to the levels calculated under the prior formulas.

To enforce its remedies, the panel *sua sponte* ordered the Plaintiffs—U.S.D. No. 259, Wichita; U.S.D. No. 308, Hutchinson; U.S.D. No. 443, Dodge City; and U.S.D. No. 500, Kansas City—to join various state officials as additional parties to the litigation. Consequently, State Treasurer Ron Estes and then-Secretary of Administration Jim Clark were joined in their official and personal capacities, with Secretary Clark later being dismissed in his personal capacity.

The parties now raise five issues among them. Estes and Clark contend they should be dismissed from the litigation, while the Plaintiffs argue they are entitled to attorney fees. The State argues (1) the panel had no authority to review the law changing

5

the entitlements for fiscal years 2016 and 2017; (2) the panel erred in concluding the equity infirmities identified in *Gannon I* had not been cured; and (3) the panel imposed an improper and unconstitutional remedy.

We reorganize the parties' arguments and hold:

1.  The panel unnecessarily ordered the State officials to be joined as parties. Accordingly, Estes and Clark are dismissed in their official capacities and Estes is dismissed in his personal capacity.

2.  The panel had the authority to review the law changing the entitlements for fiscal years 2016 and 2017.

3.  The panel properly concluded the State failed to cure the inequities affirmed to exist in *Gannon I*.

4.  The Plaintiffs are not entitled to attorney fees.

5.  The panel's remedy was premature, and we decline to enforce it.

Each of these holdings will be explained below.

FACTS

In *Gannon I*, we set forth a brief overview of public education funding to give context to the history of the litigation, the panel's holdings, and the parties' arguments. With the same goals in mind, we review the factual background relevant to our holdings here.

6

*School funding under the SDFQPA*

For more than 20 years, the SDFQPA established the formula and mechanism through which most funds for K-12 public education were obtained by Kansas school districts. See K.S.A. 72-6405 *et seq*. The formula provided a fixed amount of funding for each student through "base state aid per pupil," also known as BSAPP. K.S.A. 2014 Supp. 72-6410(b)(1).

Under the SDFQPA, a district's full-time equivalent enrollment was adjusted by various weightings based on the recognition that the needs of some students require more resources for their education than others. Once a district's enrollment was adjusted per the weightings, that figure was multiplied by the BSAPP. The resulting product was the amount of "state financial aid" to which the district was entitled. K.S.A. 2014 Supp. 72-6407(f); K.S.A. 2014 Supp. 72-6410(a).

Before our opinion in *Gannon I*, funding for the BSAPP was derived from two main sources: "local effort" and "general state aid." The majority of school districts' local effort consisted of property tax funds, as each district was statutorily required to impose a 20-mill levy upon taxable tangible property in its territory. K.S.A. 2013 Supp. 72-6431. Because property values vary widely throughout the state, the amount of money each district could raise by the required mill levy also varied widely. So the State provided additional funds to less wealthy districts through general state aid. If a district's local effort funds equaled the amount of its entitlement to state financial aid, it received no additional money from the State, *i.e.*, general state aid. And if a district's local effort funds exceeded its state financial aid entitlement, the excess was remitted to the State. For those districts qualifying for general state aid, their amount of this aid was what remained after their local effort funds were subtracted from their state financial aid entitlement. K.S.A. 72-6416; K.S.A. 2013 Supp. 72-6431(d).

After our *Gannon I* opinion was released on March 7, 2014, the 2014 legislature amended this process. The majority of funding still came from each district's required 20-mill tax levy. But instead of allowing each district to keep the proceeds from its local mill levy and remit any amount above its state financial aid entitlement to the State, the 2014 legislature required all of the proceeds to be remitted to the State. K.S.A. 2014 Supp. 72-6431(c). Each district's general state aid entitlement was then determined by first considering how much money it received from other state financing sources, which included certain unexpended and unencumbered balances remaining in a school district's general fund or program weighted funds, any tuition received from nonresident students, special education state aid, motor vehicle tax receipts, mineral production tax receipts, industrial revenue bonds, grants, and a percentage of federal impact aid. K.S.A. 2014 Supp. 72-6410(c). Then to the extent a district's state financial aid entitlement was not supplied by these other funding sources, the State provided general state aid to make up the difference. K.S.A. 2014 Supp. 72-6416(b).

State financial aid comprised most of the funding available for K-12 education. But the 2014 legislature continued to allow school districts to access additional financial assistance in several ways. Two of them remain at issue in this appeal.

First, under the SDFQPA, the legislature authorized local school boards to still impose an additional mill levy on property in its district to fund a local option budget (LOB) to augment the funds to be distributed through the BSAPP. K.S.A. 2014 Supp. 72-6433. After application of a statutory formula, in order to account for differences in property wealth among the districts, the less wealthy ones could also qualify for, and receive from the state, "supplemental general state aid." K.S.A. 2014 Supp. 72-6434. Supplemental general state aid was meant to better equalize the tax burdens for districts with less property wealth and was distributed as a percentage of a district's LOB-generated funds.

8

Second, a local board could impose an additional mill levy on property in its district to fund capital outlay expenses such as purchasing certain equipment. K.S.A. 2014 Supp. 72-8801. Although not part of the SDFQPA, the capital outlay mechanism, like the LOB, also accounted for differences in districts' property wealth. After application of a statutory formula, the less wealthy districts could also qualify for, and receive from the state, "school district capital outlay state aid." K.S.A. 2014 Supp. 72-8814(b). While both capital outlay state aid and supplemental general state aid were meant to reduce the effects of wealth-based disparities among districts, the former did not help to reduce districts' mill levies like the latter. Rather, capital outlay served to supply additional funds.

*The* Gannon *lawsuit*

The *Gannon* Plaintiffs are four school districts that lost funding beginning in fiscal year 2009 due to reductions in the BSAPP, the withholding of capital outlay state aid, and the proration of supplemental general state aid. They filed suit in Shawnee County District Court in November 2010, and a three-judge panel was later appointed pursuant to K.S.A. 2009 Supp. 72-64b03. Before the panel, the *Gannon* Plaintiffs challenged school funding on both adequacy grounds, *i.e.*, the State had not contributed enough money to provide Kansas children a "suitable education," and on equity grounds, *i.e.*, the school funding system created wealth-based disparities between Kansas' property-rich and property-poor school districts.

The panel ruled, among other things, that the legislature had violated Article 6, Section 6(b) of the Kansas Constitution by failing to provide suitable funding for education. Although affirming that Article 6 contains an adequacy component, we reversed the panel and remanded for a determination of whether the State met its duty to

9

provide adequacy in public education. 298 Kan. at 1163, 1199. We directed the panel to apply a more clearly defined adequacy test that we adopted from *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 212 (Ky. 1989), which was essentially later repeated in K.S.A. 2013 Supp. 72-1127 as the legislature's goals for providing certain educational capacities. 298 Kan. at 1170-71. As we explained:

> "With our adoption of *Rose*, we now clarify what Article 6 of our constitution requires. We hold its adequacy component is met when the public education financing system provided by the legislature for grades K-12—through structure and implementation—is reasonably calculated to have all Kansas public education students meet or exceed the standards set out in *Rose* and presently codified in K.S.A. 2013 Supp. 72-1127." 298 Kan. at 1170.

With this remand, the Plaintiffs' adequacy claims returned to the liability phase of the litigation. Per our order, these claims are not currently before the court. Supreme Court Order, July 24, 2015 (bifurcating equity and adequacy portions of the appeal and reserving briefing and oral arguments on the latter for another date).

In its initial consideration of the Plaintiffs' claims, the panel also ruled that the legislature's elimination of capital outlay state aid and proration of supplemental general state aid beginning in fiscal year 2010 created unconstitutional, wealth-based disparities among districts. In affirming that Article 6 contains an equity component, we upheld the panel's equity ruling. 298 Kan. at 1175-89. En route to that holding, we more clearly defined the test for evaluating equity under Article 6: "School districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort." 298 Kan. at 1175. We then remanded the case to the panel to "enforce these affirmed equity rulings" and ultimately ensure the inequities were cured. 298 Kan. at 1198-99.

10

With this remand, the Plaintiffs' equity claims, unlike their adequacy claims, entered the remedial phase of the litigation.

*Senate Substitute for House Bill No. 2506*

In response to the *Gannon I* equity directive of March 7, 2014, the 2014 legislature quickly enacted Senate Substitute for House Bill No. 2506 (H.B. 2506). Among other things, H.B. 2506 purported to fund both capital outlay state aid and supplemental general state aid at the full statutory level for fiscal year 2015—which would begin a few months later on July 1, 2014. L. 2014, ch. 93, secs. 7, 47.

For capital outlay state aid, the legislature made a "no limit" appropriation for fiscal year 2015 and struck language in K.S.A. 2013 Supp. 72-8814(c) banning transfers from the state general fund to the school district capital outlay state aid fund. L. 2014, ch. 93, secs. 7(j), 47(c). The transfer authorized for that year was set at $25,200,786, but it was not scheduled to occur until February 2015. Conf. Comm. Rpt. Br. Sen. Sub. H.B. 2506, April 6, 2014, p. 3. For supplemental general state aid, the 2014 legislature appropriated an additional $109,265,000 for fiscal year 2015 to supplement the $339,212,000 that already had been appropriated for that purpose. L. 2014, ch. 93, sec. 7(a); L. 2013, ch. 136, sec. 144(a).

The panel then issued a show cause order directing the parties to proffer their written positions on H.B. 2506's compliance with the *Gannon I* directive. The State responded that it had cured the constitutional inequities. The Plaintiffs agreed that, based on the available information, the State had substantially complied with our order.

At the show cause hearing on June 11, 2014, the State presented testimony from Dale Dennis, Deputy Commissioner of Education for the Kansas State Department of Education (KSDE). Dennis testified that the funding provided in H.B. 2506 was closely

11

based on calculations KSDE previously had provided to the legislature estimating the costs to fund capital outlay state aid and supplemental general state aid at the full statutory levels for fiscal year 2015. In preparing these estimates, KSDE used property valuation data from fiscal year 2013—the most current data available at the time—to arrive at the $25,200,786 figure for capital outlay state aid and the additional $109,265,000 for supplemental general state aid.

Because both aid estimates were based upon fiscal year 2013 property values, any increase in fiscal year 2014 values could cause an increase in the needed aid funds. Dennis therefore acknowledged that the actual amount needed to fully fund both formulas would ultimately depend on the final property valuation data for fiscal year 2014—as well as local decision-making by school boards in setting their actual budgets for fiscal year 2015, which would be known later that summer.

The State acknowledged at the hearing that KSDE's figures were estimates. But its counsel nevertheless expressed the legislature's desire to fully fund capital outlay state aid and supplemental general state aid following the *Gannon I* order: "We can't know exactly, but tell us what ['fully fund'] means, and we'll do that. We won't fund short of it, we'll go the full amount."

After brief oral argument, the panel announced from the bench that the 2014 legislature had complied with the *Gannon I* equity order by fully funding capital outlay state aid and supplemental general state aid for fiscal year 2015. But it declined to dismiss the equity portion of the case, citing language from the *Gannon I* opinion that "the panel need not take any additional action" if capital outlay state aid and supplemental general state aid were fully funded. See 298 Kan. at 1198-99.

12

This ruling was later memorialized in the panel's Memorandum Opinion and Order on Remand, filed December 30, 2014: "We found [at the June 11, 2014, hearing], and do find, the legislature substantially complied with their obligations in regard to supplemental state aid and capital outlay. No further journal entry is required beyond our finding here."

*Events occurring after the panel's initial finding of substantial compliance*

After H.B. 2506 became law on May 1, 2014, several events caused it to fall short of the amount required to fully fund both formulas for fiscal year 2015. Sometime in June 2014, the final valuation data for fiscal year 2014 (ending June 30, 2014) became available, and the districts used it to estimate the amount of capital outlay state aid and supplemental general state aid they would be entitled to receive in the new fiscal year. And as districts were finalizing their fiscal year 2015 budgets in the summer of 2014, many of them decided to increase their capital outlay budgets by raising their local capital outlay mill levies. Some also increased the amount of their LOB-generated funds by increasing the LOB percentage allowed by state law. Their decisions necessarily meant qualifying districts would experience an attendant rise in state aid, typically because of their increased tax effort. Placing the new property valuation data and budget figures in the respective aid formulas resulted in approximately $54 million more being due for state aid in fiscal year 2015.

These events were to make clear that if—like the 2014 legislature—its 2015 counterpart intended to fully fund the capital outlay and supplemental general state aid entitlements, supplemental appropriations would be necessary. According to information presented at a later panel hearing, such gaps are not uncommon because of how the timing of the legislative session intersects with the school districts' budget cycle. Per Deputy Commissioner Dennis and counsel for the State, historically the legislature has

passed a supplemental funding bill to cover the difference between the amount initially appropriated and the amount actually owed.

But the 2015 legislature and the governor opted for a different path.

*2015 legislation*

An increased amount was needed to fully fund capital outlay state aid and supplemental general state aid for fiscal year 2015, and the governor's budget called for fully funding both entitlements. The January 2015 budget report recommended a supplemental appropriation of $54.1 million—$19.8 million for capital outlay state aid and $34.3 million for supplemental general state aid.

But in the governor's State of the State address on January 15, 2015, he called for legislative repeal of the existing school finance formula and appropriation of money directly to the school districts for the next 2-year budget cycle: fiscal years 2016 and 2017. Moreover, on February 5, 2015, due to lower than projected sales tax revenues, the governor announced an allotment that reduced the BSAPP from $3,852 to $3,810.50 for fiscal year 2015 that would end 5 months later on June 30. If implemented, this allotment would have resulted in the loss of $28.3 million in operating funds for the districts.

In his press release announcing the allotment, the governor also recommended the legislature reform the formulas for capital outlay state aid and supplemental general state aid, *i.e.*, "equalization aid," and "stall" the increase of the $54 million required to fully fund those formulas for fiscal year 2015. He declared that "[b]y reforming the equalization factors, the legislature could, and should, restore the 1.5 percent allotment [of $28.3 million in operating funds]."

14

The 2015 legislature quickly heeded the governor's calls for action, principally through passage of two bills—House Substitute for Senate Bill No. 4 (S.B. 4), signed by the governor on February 10, and House Substitute for Senate Bill No. 7 (S.B. 7), signed by the governor on March 25.

*House Substitute for Senate Bill No. 4*

After the governor exercised the February 5 allotment to reduce the BSAPP by $28.3 million in operating funds, the legislature responded to his request to stall the increase in equalization aid through the passage of S.B. 4. Regarding capital outlay, S.B. 4 authorized a transfer of $25.3 million—*i.e.*, the amount authorized during the 2014 session—on February 20 from the state general fund to the capital outlay state aid fund. It also ordered the Kansas State Board of Education to pay each district entitled to capital outlay state aid its proportionate share of that funding. S.B. 4 further authorized a second transfer scheduled to occur on June 20 for "the remaining amount of [capital outlay state aid] moneys to which the school districts are entitled to receive." L. 2015, ch. 1, sec. 54(d). These actions left open the possibility that more revisions to the school funding system could be approaching.

*House Substitute for Senate Bill No. 7*

The 2015 legislature made more changes in March through S.B. 7. It appropriated an additional $27.3 million in general state aid, *i.e.*, BSAPP funds, for fiscal year 2015 to approximately restore the cuts that would have been made to districts' operating funds because of the February 5 allotment. But S.B. 7 also reduced districts' capital outlay state aid and supplemental general state aid entitlements for that year by approximately $54 million—the amount of equalization entitlements the governor originally had called for funding in his budget in January. This $54 million reduction was achieved by revising the formulas for capital outlay state aid and supplemental general state aid. L. 2015, ch. 4, secs. 1(a), 38, 63. These alterations to the school funding system in March occurred

15

nearly 9 months into fiscal year 2015 and resulted in immediate losses to the districts receiving those types of aid.

S.B. 7's amendments to the capital outlay state aid and supplemental general state aid formulas applied only to fiscal year 2015. For fiscal years 2016 and 2017, S.B. 7 repealed the more than 20-year-old SDFQPA and replaced it with a block grant system, which essentially froze for 2 more years all school funding provided by the State at fiscal year 2015 levels. This new funding system is known as the Classroom Learning Assuring Student Success Act, or CLASS. See L. 2015, ch. 4, secs. 4-22; K.S.A. 2015 Supp. 72-6463 *et seq*. CLASS purports to provide each school district a block grant in fiscal years 2016 and 2017 that "will be . . . at least equal to, the total state financial support as determined for school year 2014-2015 [fiscal year 2015] under the [SDFQPA], prior to its repeal." L. 2015, ch. 4, sec. 4(b).

More specifically, each district's block grant contains funding that corresponds to the monies it received under the SDFQPA in fiscal year 2015, including:  (1) the amount of general state aid (*i.e.*, BSAPP funds) it received in fiscal year 2015, with certain reductions; (2) the amount of supplemental general state aid it received in fiscal year 2015; (3) the amount of capital outlay state aid it received in fiscal year 2015; (4) the amount attributable to tax proceeds collected by the district in each fiscal year for the declining enrollment tax levy, ancillary school facilities tax levy, and cost of living tax levy; and (5) virtual school state aid as recalculated under CLASS. Each block grant also includes an amount equal to the district's KPERS employer contribution. L. 2015, ch. 4, sec. 6(a)(1)-(6).

Additionally, CLASS requires that an amount equal to 0.4% of a district's fiscal year 2015 general state aid be deducted from its block grant to fund a new category of school funding called extraordinary need state aid for which a district may apply to the

State Finance Council. L. 2015, ch. 4, secs. 6(a)(7), 17. In determining within its discretion whether a district has shown the requisite extraordinary need for additional funds, the governor-chaired council is to consider whether a district has experienced an extraordinary increase in enrollment, an extraordinary decrease in assessed property valuation per pupil (AVPP), or any other unforeseen acts or circumstances that have substantially impacted the district's budget. L. 2015, ch. 4, sec. 17(b).

*The Plaintiffs' response to action taken during the 2015 legislative session*

Before S.B. 4 and S.B. 7 materialized, on January 27, 2015, the Plaintiffs filed a motion to alter the panel's December 30, 2014, judgment regarding equity "based on the availability of new evidence and to prevent a manifest injustice." First, citing a December 2014 memorandum from the State's budget director to the governor, the Plaintiffs reported that the estimates provided to the panel before its June 11, 2014, hearing were less than the actual amount required to fully fund capital outlay state aid and supplemental general state aid for fiscal year 2015.

The Plaintiffs acknowledged that the governor had recommended full funding for both entitlements in his January 2015 budget report. But they argued there was "no guarantee that the Legislature will comply with those recommendations, especially in the face of significant budget cuts that will need to be made." Accordingly, they asked for an injunction ordering the State to fully fund both entitlements for fiscal year 2015. The Plaintiffs later filed a supplemental brief in support of this motion to tell the panel about the governor's February 5 allotment and the passage of S.B. 4.

Although the allegations made in the Plaintiffs' motion to alter judgment may have been speculative when they filed their January 27 motion, their concerns were confirmed on March 25 when S.B. 7 was signed by the governor. The Plaintiffs responded the next

day with a motion for declaratory and injunctive relief, informing the panel that S.B. 7 (1) reduced funding for capital outlay state aid and supplemental general state aid by over $50 million and (2) revoked the SDFQPA, "including the provisions of H.B. 2506 that purported to fund and cure the equity issue," which had been enacted during the 2014 legislative session after *Gannon I*. Accordingly, they asked for a panel order:

"(1) reversing its previous finding that the State is in substantial compliance with the mandate of the Kansas Supreme Court and that no further action is needed with regard to equity; (2) encumbering and distributing the funds promised to the districts through the operation of H.B. 2506; (3) enjoining the State from enforcing S.B. 7; and (4) reinstating the previous school finance law the State attempted to repeal[] within S.B. 7."

*The panel's June 26, 2015, memorandum opinion and order*

After a hearing on the Plaintiffs' motions on May 7 and 8, 2015, the panel issued a memorandum opinion and order on June 26. At the outset, the panel determined that its previous finding of the State's substantial compliance with this court's order in *Gannon I* "was both premature and incorrect." Accordingly, it withdrew its finding and reopened the equity issue.

Ultimately, the panel held that S.B. 7 failed to meet both the equity and adequacy requirements of Article 6 of the Kansas Constitution. Relevant to the issues presently before this court, the panel declared the provisions of S.B. 7 concerning capital outlay state aid and supplemental general state aid "are not only unconstitutional on their face, but are also non-compliant with the noted March [7], 2014 judgment of the Kansas Supreme Court." Its holding encompassed amendments to both aid formulas for fiscal year 2015 and to the block grant provisions under CLASS freezing the funding for fiscal years 2016 and 2017 at 2015 levels. See L. 2015, ch. 4, secs. 6(a)(2)-(3), 38, 63.

The panel then issued a series of remedial orders to enforce its holdings. It first issued a temporary restraining order requiring general state aid, *i.e.*, BSAPP funds, to be distributed through the block grants—not based on the fiscal year 2015 funding levels as required by CLASS—but "based on the *weighted student count in the current school year in which a distribution is to be made*."

To remedy the capital outlay inequities, the panel struck as unconstitutional the S.B. 7 provisions revising the capital outlay state aid formula and several related enactments from the 2015 legislative session. This order effectively reinstated the capital outlay statutes (K.S.A. 72-8801 *et seq.*) as they existed before January 1, 2015, which in turn increased the aid due for fiscal years 2015 through 2017. This remedy was partially intended to still allow capital outlay state aid to be distributed under CLASS for fiscal years 2016 and 2017 but as calculated under the previous formula instead of repeating the reduced entitlement for fiscal year 2015.

As part of its fiscal year 2015 remedy, the panel ordered the State to certify the districts' capital outlay state aid entitlements and make the transfers and payments necessary to fully fund the aid under the prior formula contained in K.S.A. 2014 Supp. 72-8814(b). It further enjoined those state officials involved in making the payments from taking any action contrary to its order. But the panel did not order additional appropriations for capital outlay state aid for fiscal years 2016 and 2017. Rather, it announced it was "rely[ing] on each legislator's solemn oath of office and respect for our constitutional form of government to provide such [appropriation] authority."

The panel entered similar orders regarding supplemental general state aid. It struck as unconstitutional parts of the provision amending that formula in S.B. 7, as well as identical language in another 2015 bill that contained an amendment to S.B. 7. As with capital outlay, the panel's order effectively reinstated the previous supplemental general

19

state aid formula, which in turn increased the aid due. It ordered the State to pay on or after July 1, 2015, the additional entitlement due under the previous formula for fiscal year 2015. But again, as with capital outlay, the panel declined to order the legislature to appropriate additional funds for supplemental general state aid for fiscal years 2016 and 2017. Rather, it reiterated that it would rely upon the legislators' solemn oath of office to make a sufficient appropriation.

Despite finding it unconstitutional, the panel did not strike the block grant funding mechanism because it believed its other remedial orders would act to "mitigate the urgency for giving any immediate effect to, or remedy in regard to, [its] ruling in regard to [CLASS]." But it entered an alternative order to apply if its other orders failed. Generally speaking, the alternative order would strike the amendments to the capital outlay state aid and supplemental general state aid formulas—and strike CLASS, plus several other related provisions in S.B. 7. This order would also require any remaining appropriated funds not yet distributed for fiscal year 2015 to be paid pursuant to the SDFQPA and capital outlay statutes as they had existed on January 1, 2015.

In response to the panel's holdings, the State filed three notices of appeal due to language in K.S.A. 2015 Supp. 60-2102(b)(1) that makes it unclear whether the filing of postjudgment motions tolls the time to appeal in a case challenging school funding under Article 6 of the Kansas Constitution. After a series of remands to the panel, the State filed its last notice of appeal in the district court on June 26, 2015, and a docketing statement in this court on June 29, 2015. That same day, it also filed in this court a Motion for Stay of Operation and Enforcement of the Panel's Judgment, which we granted on June 30, 2015.

This court's jurisdiction arises from K.S.A. 2015 Supp. 60-2102(b)(1) (jurisdiction of supreme court may be invoked by appeal as a matter of right from a preliminary or

final decision in which a statute has been held unconstitutional under Article 6 of the Kansas Constitution).

More facts will be added as necessary to our analysis.

ANALYSIS

Issue 1: *The panel unnecessarily joined Ron Estes in his official capacity as Kansas State Treasurer and in his personal capacity and Jim Clark in his official capacity as Secretary of the Kansas Department of Administration.*

On remand from our order in *Gannon I*, the panel *sua sponte* ordered the Plaintiffs to join the Kansas State Treasurer and the Director of Accounts and Reports at the Kansas Department of Administration in their official and individual capacities to provide "for the enforcement of any orders that might subsequently ensue." The Plaintiffs dutifully filed an amended petition to join Ron Estes, State Treasurer, and Jim Clark, Secretary of Administration. Clark was joined in lieu of the Director of Accounts and Reports because that position no longer exists within the Department of Administration.

The State moved to strike the amended petition, arguing among other things that joinder was unnecessary. Estes and Clark both filed motions to dismiss, which were denied, but Clark was later dismissed in his personal capacity because he retired in June 2015.

Neither the Plaintiffs nor the State addresses joinder on appeal. Estes, however, argues he should be dismissed in his official and individual capacities. Clark does not explicitly seek dismissal but argues the panel erred in *sua sponte* directing the Plaintiffs to join the state officials.

21

*Standard of review*

The panel did not cite any statute when directing the Plaintiffs to join Estes and Clark, but it directed that they be joined as "contingently necessary parties." In a prior version of the compulsory joinder statute, a "contingently necessary" person was required to be joined as a party if complete relief could not be given in that person's absence. See K.S.A. 60-219(a)(1). This statute was amended in 2010. Although it no longer refers to contingently necessary persons, it still requires a person to be joined as a party if "[i]n that person's absence, the court cannot accord complete relief among existing parties . . . ." K.S.A. 2015 Supp. 60-219(a)(1)(A). So we will analyze the joinder claim under the current version of the statute.

To the extent we must engage in statutory interpretation, our review is unlimited. See *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). As we have said many times, when interpreting a statute

> "'[t]he fundamental rule to which all other rules are subordinate is that the intent of the legislature governs if that intent can be ascertained. When language is plain and unambiguous, there is no need to resort to statutory construction. An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there.' [Citation omitted.]" 301 Kan. at 918-19.

Whether the evidence demonstrates the requirements of the compulsory joinder statute have been met is a mixed question of fact and law. As we have previously explained:

> "When an appellate court reviews these mixed questions, it applies a bifurcated standard of review. Insofar as any of the panel's factual findings are in dispute, the court applies a substantial competent evidence standard. See *Progressive Products, Inc. v. Swartz*, 292

Kan. 947, 955, 258 P.3d 969 (2011). 'Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.' *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007). In determining whether substantial competent evidence supports the district court findings, appellate courts disregard any conflicting evidence or other inferences that might be drawn from the evidence. *Unruh v. Purina Mills*, 289 Kan. 1185, 1196, 221 P.3d 1130 (2009).

"The panel's conclusions of law based on those findings are subject to unlimited review. [Citation omitted.]" *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014) (*Gannon I*).

*Discussion*

K.S.A. 2015 Supp. 60-219(a)(1)(A) unambiguously requires a person to be joined as a party "if . . . [i]n that person's absence, the court cannot accord complete relief among existing parties." The use of the word "if" makes the inability to grant complete relief among the existing parties a condition to joining outsiders as parties to the litigation. See American Heritage Dictionary of the English Language 654 (1971) (defining "if" as "[o]n condition that"); see also *State ex rel. Schmidt v. City of Wichita*, 303 Kan. __, __ P.3d __, 2016 WL 275298, at *11 (No. 113,528, filed January 22, 2016). We conclude that condition has not been met here.

The relief ordered by the panel would have required the State to pay an additional $54 million in capital outlay state aid and supplemental general state aid for fiscal year 2015 had we not stayed its orders. To effectuate these orders, the panel enjoined the Kansas State Board of Education to certify the entitlements, the Secretary of Administration to make the funds transfers necessary to pay the entitlements, and the State Treasurer to honor the entitlements. The panel's order further enjoined these officials from "issuing, following, or honoring any other directive, practice, or policy in

23

regard to these Orders that would, whether directly or indirectly, act to hinder, delay, offset, compromise, dilute, or diminish the effect of timely accomplishment of these Orders . . . ."

Injunctions are governed by K.S.A. 2015 Supp. 60-906, which provides in pertinent part: "Every order granting an injunction . . . *shall be binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys . . . .*" (Emphasis added.) The italicized language makes clear that, regardless of whether the officials themselves are parties, they would be bound by an injunction against the State because the State is a party and they are officers or agents of the State.

Moreover, if a state official refused to comply with a court order in such circumstances, an additional remedy could be provided through a civil contempt proceeding—the purpose of which is to coerce a person to comply with a court order. *Comprehensive Health of Planned Parenthood v. Kline*, 287 Kan. 372, 417, 197 P.3d 370 (2008) ("Civil contempt is the failure to do something ordered by the court for the benefit or advantage of another party to the proceeding."); *State v. Jenkins*, 263 Kan. 351, 358, 950 P.2d 1338 (1997) ("Civil contempt is a remedial or corrective action meant to coerce a party into action."); see also K.S.A. 2015 Supp. 20-1204a ("When an order in a civil action has been entered, the court that rendered the same may order a person alleged to be guilty of indirect contempt of such order to appear and show cause why such person should not be held in contempt . . . .").

Accordingly, we conclude joinder of Estes and Clark in their official capacities was unnecessary because complete relief could be granted through the injunction statute. Moreover, the Plaintiffs could bring civil contempt proceedings if these officials failed to comply. So we dismiss both Estes and Clark in their official capacities.

We also conclude that Estes was unnecessarily joined in his personal capacity. The panel ordered him to be joined to enforce its eventual orders. But, as Estes observes in his brief, "no relief was contemplated in this case against Estes outside of the possibility of injunctive relief for actions he might take as part of his official duties." Accordingly, should Estes fail to follow any order implicating his official duties as State Treasurer, the Plaintiffs could bring a civil contempt proceeding to compel his compliance. So because complete relief can be accorded without his participation as a party, we also dismiss Estes in his personal capacity.

Finally, we address the penultimate paragraph in the panel's June 26, 2015, entry of judgment purportedly joining the Kansas State Board of Education "as a party for the purpose of remedy." The Board has apparently failed to acknowledge its joinder as a party, as it has not entered an appearance in this court. The Plaintiffs and the State have similarly failed to make such an acknowledgment. They have not challenged on appeal the Board's joinder or served the Board with their briefs or any other filings made with the Clerk of the Appellate Courts.

Even assuming without deciding that the panel successfully joined the Board, we would still dismiss the Board for the same reasons we have dismissed Estes and Clark in their official capacities. As with those two officials, complete relief can be obtained without the Board as a party. Accordingly, to the extent the Board was joined, it too is dismissed.

We now proceed to the merits.

Issue 2: *The panel did not exceed the scope of this court's remand order in* Gannon I *by considering whether the provisions of S.B. 7 governing school funding for fiscal years 2016 and 2017 violated the equity component of Article 6.*

The State argues the panel lacked the authority to consider the constitutionality of the funding system under CLASS for fiscal years 2016 and 2017. It contends the panel only had the authority to review S.B. 7's fiscal year 2015 provisions.

The Plaintiffs disagree, pointing to the language of the *Gannon I* remand order. They contend that, because the State failed on remand to cure the confirmed inequities by fully funding the capital outlay state aid and supplemental general state aid formulas as they existed at the time of our March 7, 2014, opinion, the panel was obligated to apply *Gannon I*'s equity test to any remedial legislation. In other words, the panel was required to assess all new legislation for compliance with Article 6.

*Standard of review and principles of law*

Determining whether the panel exceeded the scope of our remand order requires us to interpret the *Gannon I* mandate. "Interpretation of an appellate court mandate and the determination of whether the district court complied with it on remand are both questions of law subject to de novo review." *State v. Morningstar*, 299 Kan. 1236, 1240-41, 329 P.3d 1093 (2014).

On remand, "[a] trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *State v. Collier*, 263 Kan. 629, Syl. ¶ 4, 952 P.2d 1326 (1998). And in previous cases, we have consistently examined district court action for compliance with an appellate court mandate by looking at both the language of the mandate and the attendant circumstances. See, *e.g.*, *Colorado Interstate Gas Co. v. Beshears*, 271 Kan.

26

596, 605, 24 P.3d 113 (2001) (examining effect of Court of Appeals' reversal of summary judgment for district court's failure to conduct a "meaningful inquiry" on later summary judgment proceedings and rejecting contention that the mandate precluded entry of summary judgment on remand); *Hodge v. Bishop*, 101 Kan. 152, 155, 165 P. 644 (1917) (rejecting claim that judgment should be entered in a party's favor based on prior appeal when Supreme Court did not mandate a particular judgment but merely directed the lower court to adjudicate the claim).

A lower court is bound to follow an appellate court's mandate and has no authority to consider matters outside the mandate. See *Kansas Baptist Convention v. Mesa Operating Ltd. Partnership*, 258 Kan. 226, 231, 898 P.2d 1131 (1995); see also K.S.A. 60-2106(c) (appellate court mandate and opinion "shall be controlling in the conduct of any further proceedings necessary in the district court"). This rule is so fundamental that we have labeled it "axiomatic." See *Collier*, 263 Kan. 629, Syl. ¶ 4.

*Discussion*

With these principles in mind, we first turn to the equity language of our remand order in *Gannon I*, where we said:

> "We . . . affirm the panel's rulings that the State failed to meet its duty to provide equity in public education as required under Article 6 of the Kansas Constitution. More specifically, we affirm the panel's holding that the State established unreasonable, wealth-based disparities by (1) withholding all capital outlay state aid payments to which certain school districts were otherwise entitled under K.S.A. 2012 Supp. 72-8814(c) and (2) prorating all supplemental general state aid payments to which certain districts were entitled under K.S.A. 2012 Supp. 72-6434 for their local option budgets.

27

*"We remand for the panel to enforce these affirmed equity rulings. Because the legislature should have an opportunity to expeditiously address these inequities, its actions may require additional panel review."* (Emphasis added.) 298 Kan. at 1197-98.

We then provided guidance to the panel by outlining possible legislative scenarios it could face on remand, depending upon the legislature's response:

"1.    As to capital outlay:

    a.  If by July 1, 2014, the legislature fully funds the capital outlay provision as contemplated in K.S.A. 2013 Supp. 72-8814, the panel need not take any additional action on this issue.

    b.  If by July 1, 2014, the legislature acts to cure—whether by statutory amendment, less than full restoration of funding to prior levels, or otherwise—the panel must apply our test to determine whether that legislative action cures the inequities it found and which we have affirmed. More specifically, the panel must assess whether the capital outlay state aid—through structure and implementation—then gives school districts reasonably equal access to substantially similar educational opportunity through similar tax effort. If the legislative cure fails this test, the panel should enjoin its operation and enter such orders as the panel deems appropriate.

    c.  If by July 1, 2014, the legislature takes no curative action, the panel shall declare null and void that portion of K.S.A. 2013 Supp. 72-8814(c) prohibiting transfers from the state general fund to the school district capital outlay state aid fund. This will enable the funds envisioned by the statutory scheme to be available to school districts as intended.

28

d. Ultimately, the panel must ensure the inequities in the present operation of the capital outlay statutes, K.S.A. 72-8801 *et seq.,* are cured.

"2. As to the local option budget and supplemental general state aid:

a. If by July 1, 2014, the legislature fully funds the supplemental general state aid provision as contemplated in the existing SDFQPA, K.S.A. 72-6405 *et seq.,* without proration, the panel need not take any additional action on this issue.

b. If by July 1, 2014, the legislature acts to cure—whether by statutory amendment, less than full restoration of funding to prior levels, or otherwise—the panel must apply our test to determine whether such action cures the inequities it found and which findings we have affirmed. If the panel then determines those inequities are not cured, it should enjoin operation of the local option budget funding mechanism, K.S.A. 2013 Supp. 72-6433 and 72-6434, or enter such other orders as it deems appropriate.

c. If by July 1, 2014, the legislature takes no curative action, the panel should enjoin operation of the local option budget funding mechanism, K.S.A. 2013 Supp. 72-6433 and 72-6434, or enter such other orders as it deems appropriate.

d. Ultimately, the panel must ensure the inequities in the present operation of the local option budget and supplemental general state aid statutes are cured." 298 Kan. at 1198-99.

The State admits the panel had the authority to "evaluate and declare whether S.B. 7 substantially complied with *Gannon*'s mandate as it concerned equity." But without discussing the language of our mandate and what it actually requires, the State

29

nevertheless contends the panel improperly "consider[ed] matters that were not essential to implementing the mandate" when the panel reviewed CLASS's capital outlay and supplemental general state aid provisions for compliance with Article 6. It complains that the CLASS inequities the panel found due to the "freeze" of funds for fiscal years 2016 and 2017 at fiscal year 2015 levels for both types of aid are different from the inequities affirmed to exist in *Gannon I*. Accordingly, the State asserts the panel had no authority to consider whether the provisions were constitutional.

This argument ignores the directive in our *Gannon I* orders, however. Regarding capital outlay, we specifically instructed the panel to review any legislative action taken in response to our opinion for constitutional compliance when we said:

"b. If *by July 1, 2014, the legislature acts to cure*—whether by statutory amendment, less than full restoration of funding to prior levels, or otherwise—the panel must apply our test to determine whether *that legislative action* cures the inequities it found and which we have affirmed. More specifically, the panel must assess whether the capital outlay state aid—through structure and implementation—then gives school districts reasonably equal access to substantially similar educational opportunity through similar tax effort. If *the legislative cure* fails this test, the panel should enjoin *its operation* and enter such orders as the panel deems appropriate." (Emphasis added.) 298 Kan. at 1198.

These words are echoed in language previously quoted regarding supplemental general state aid. Both provisions demonstrate our clear intention to grant the panel broad authority to review future legislation and to ensure the legislature's chosen cure remedied the constitutional inequities identified in the school funding system. In short, although CLASS was enacted after July 1, 2014, the panel needed to review CLASS to comply with our directive that it "ensure the inequities in the present operation of the local option

budget and supplemental general state aid [and capital outlay state aid] statutes are cured." 298 Kan. at 1198-99.

We also disagree with the State that the panel lacked authority to consider these aid provisions under CLASS because they represent "a substantial shift in Kansas' financing of K12 public education." The State quotes at length from our opinion in *Montoy v. State*, 282 Kan. 9, 25, 138 P.3d 755 (2006) (*Montoy IV*), where we refused to review the constitutionality of remedial legislation that had "so fundamentally altered the school funding formula that the school finance formula that was at issue in this case no longer exists."

We cannot make a similar "substantial shift" observation about CLASS. This act simply freezes the fiscal year 2016 and 2017 capital outlay state aid and supplemental general state aid entitlements at the 2015 levels. CLASS provides:

"(a) For school year 2015-2016 and school year 2016-2017, the state board shall disburse general state aid to each school district in an amount equal to:

. . . .

(2) the amount of *supplemental general state aid* such school district received for school year 2014-2015, if any, pursuant to K.S.A. 72-6434, prior to its repeal, as prorated in accordance with K.S.A. 72-6434, prior to its repeal, plus;

(3) the amount of *capital outlay state aid* such school district received for school year 2014-2015, if any, pursuant to K.S.A. 2014 Supp. 72-8814, prior to its repeal . . . ." (Emphasis added.) L. 2015, ch. 4, sec. 6(a)(2)-(3).

See also L. 2015, ch. 4, sec. 4(b) ("Each school district's block grant [for fiscal years 2016 and 2017] will be based in part on, and be at least equal to, the total state financial

support as determined for school year 2014-2015 under the [SDFQPA], prior to its repeal.").

In sum, the legislature essentially created CLASS as a mere extension of the fiscal year 2015 funding system. It is not a substantial shift in the way funds are distributed for public education. We are not the only appellate court to reach this conclusion. As the 10th Circuit Court of Appeals declared: "Despite the changes to Kansas' system of school financing, the core elements challenged by plaintiffs remain. Although the SDFQPA formula has been replaced by block grants for the next two years, those grants are calculated primarily using the now-repealed SDFQPA formula." *Petrella v. Brownback*, 787 F.3d 1242, 1256 (10th Cir. 2015).

Given the language of our *Gannon I* orders and the circumstances of this case, we conclude the panel did not exceed the scope of our mandate by reviewing CLASS for compliance with the equity requirement of Article 6. Accordingly, we proceed to review the panel's holdings that the amendments to the school funding system in fiscal years 2015, 2016, and 2017 not only violated our orders but also failed to comply with the Kansas Constitution.

Issue 3: *The panel properly determined that the State did not comply with this court's orders in* Gannon I *to cure the unconstitutional inequities present in the operation of Kansas' K-12 public education funding system.*

In its June 26, 2015, memorandum opinion and order, the panel concluded that the State had failed to cure the inequities affirmed to exist in *Gannon I*. On appeal, the State argues that the panel failed to apply the proper equity test in reaching this conclusion and that the legislature cured the inequities. The Plaintiffs counter that the panel "faithfully" applied the equity test and that its ultimate conclusion was justified by the facts.

32

We hold that the panel properly applied our test and affirm its holding that the inequities found to exist in *Gannon I* have not yet been cured.

*Standard of review and burden of proof*

Whether the State has complied with our order in *Gannon I* raises a mixed question of fact and law. When reviewing a mixed question, we review the district court's factual findings for substantial competent evidence and its legal conclusions de novo. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014) (*Gannon I*).

The panel's June 2015 order does not allocate the burden of proof to either party. At the May 7-8, 2015, hearing, Judge Franklin R. Theis, speaking for the panel, stated he thought that the burden was on the State to show compliance, but he also indicated that it ultimately did not matter which party carried the burden.

Before this court the parties agree the State has the burden to show it has complied with our orders in *Gannon I*—at least for fiscal year 2015. But the State contends that any prospective application of S.B. 7 is entitled to a presumption of constitutionality—*i.e.*, that the burden is on the Plaintiffs to show CLASS is unconstitutional. We reject this contention. Our decisions in *Montoy* are instructive.

In *Montoy v. State*, 278 Kan. 769, 771, 120 P.3d 306 (2005) (*Montoy II*), we affirmed the district court's holding that the legislature had failed to make suitable provision for finance of the educational interests of the State under Article 6. But we stayed our January 2005 mandate to give the legislature a reasonable time to cure the constitutional infirmity. See 278 Kan. at 776 ("To ensure the legislature complies with our holding, we will withhold our formal opinion until corrective legislation has been enacted or April 12, 2005, whichever occurs first, and stay the issuance of our mandate in

33

this case."). During its next session, the legislature enacted House Bill No. 2247 (H.B. 2247), L. 2005, ch. 152, which revised several provisions of the SDFQPA.

When we ordered the parties to appear and argue whether H.B. 2247 achieved constitutional compliance, we allocated the burden of proof to the State. We noted that "because the plaintiffs had prevailed, the burden of proof had 'shifted to the defendants to show that the legislature's action has resulted in suitable provision for the financing of education as required by Article 6, § 6.'" *Montoy v. State*, 279 Kan. 817, 820, 112 P.3d 923 (2005) (*Montoy III*) (quoting Supreme Court Order of April 15, 2005). The State responded that the new legislation "should enjoy a presumption of constitutionality and the burden of proof should be upon the plaintiffs to demonstrate otherwise." 279 Kan. at 822. But we expressly rejected that argument because the case was in the remedial phase. We said:

> "While this presumption normally applies to initial review of statutes, in this case we have already determined the financing formula does not comply with Article 6, § 6. H.B. 2247 was passed because this court ordered remedial action. The State now presents its remedy for our determination of whether it complies with our order." 279 Kan. at 825-26.

To support our rationale, we relied on the general rule that "a party asserting compliance with a court decision ordering remedial action bears the burden of establishing that compliance . . . ." 279 Kan. at 826. We also cited the Ohio Supreme Court, which had rejected a similar argument in a school finance case. 279 Kan. at 826 (quoting *DeRolph v. State*, 89 Ohio St. 3d 1, 12, 728 N.E.2d 993 [2000] [*DeRolph II*]).

In sum, we reject the State's claims that the presumption of constitutionality that generally applies to our initial review of statutes should extend to the remedial phase. The State has the express burden to show compliance.

*Discussion*

*The equity standard under Article 6*

In *Gannon I*, while we recognized that equity had long been an important consideration in school finance cases, we also recognized that we had never articulated a clear test for measuring equity under Article 6. See 298 Kan. at 1163, 1172-73. In clarifying our test, we first looked to our *Montoy* precedent, noting our prior holding that "'[e]quity does not require the legislature to provide equal funding for each student or school district.'" 298 Kan. at 1173 (quoting *Montoy IV*, 282 Kan. at 22). We further observed that we had rejected legislation that increased or exacerbated inequities among districts in evaluating action taken by the legislature in the remedial stage of *Montoy*. 298 Kan. at 1173-74 (quoting *Montoy III*, 279 Kan. at 834, 840) (concluding increase in LOB cap without additional supplemental general state aid exacerbated wealth-based disparities among districts and thus fell short of standard set in Article 6).

Additionally, we reviewed an analogous case in which the Texas Supreme Court had found "'glaring disparities in the abilities of the various school districts to raise revenues from property taxes because taxable property wealth varies greatly from district to district.'" 298 Kan. at 1174 (quoting *Edgewood Indep. School Dist. v. Kirby*, 777 S.W.2d 391, 392 [Tex. 1989]). The Texas Supreme Court determined that those wealth-based disparities violated the efficiency requirement of the Texas Constitution's education article and held:

> "'There must be a direct and close correlation between a district's tax effort and the
> educational resources available to it; in other words, districts must have substantially
> equal access to similar revenues per pupil at similar levels of tax effort. Children who live
> in poor districts and children who live in rich districts must be afforded a substantially

35

equal opportunity to have access to educational funds.'" 298 Kan. at 1174 (quoting 777 S.W.2d at 397).

We agreed with the basic principle embraced by the Texas Supreme Court and thus clarified our test for measuring equity under Article 6: "School districts must have reasonably equal access to substantially similar educational opportunity through similar tax effort." 298 Kan. at 1174-75. After applying our test, we affirmed the panel's holdings that the State had created, or perhaps maintained, wealth-based disparities among districts by eliminating capital outlay state aid and prorating supplemental general state aid beginning in fiscal year 2010. See 298 Kan. at 1180, 1188.

For both types of aid, we cautioned the panel against applying a "zero-tolerance" test when reviewing remedial legislative action on remand. Specifically, we reiterated that equity was not necessarily the equivalent of equality and warned that "wealth-based disparities should not be measured against such mathematically precise standards." 298 Kan. at 1180, 1188. We instructed the panel instead to evaluate any legislative response by considering "whether it sufficiently reduces the unreasonable, wealth-based disparity so the disparity then becomes constitutionally acceptable, not whether the cure necessarily restores funding to the prior levels." 298 Kan. at 1181, 1188-89.

*The panel applied the proper equity test.*

The State claims the panel ignored our warning, however. It argues that, instead of applying the *Gannon I* equity test, the panel actually applied a zero-tolerance test that rendered unconstitutional any amount below full funding of the previous versions of the capital outlay state aid and supplemental general state aid formulas. It further contends the panel presumed that less than full funding of the previous formulas necessarily violates the equity component of Article 6 of the Kansas Constitution—*i.e.*, that it set the

36

formulas previously approved by the court in *Montoy IV* as a baseline for Article 6 compliance. The Plaintiffs disagree with the State's characterization of the panel's action.

In *Gannon I*, we acknowledged the State could cure the inequities affirmed to exist in a variety of ways. See 298 Kan. at 1181, 1188. We advised that one way to cure would be to fully fund the capital outlay and supplemental general state aid formulas as set out in K.S.A. 2013 Supp. 72-8814 and 72-6434, respectively. See, *e.g.*, 298 Kan. at 1198-99 ("As to capital outlay: a. If by July 1, 2014, the legislature fully funds the capital outlay provision as contemplated in K.S.A. 2013 Supp. 72-8814, the panel need not take any additional action on this issue.").

Referring to our outline of possible legislatively-created scenarios it could face on remand, the panel noted the subdivisions of classifications and labeled this particular solution "Option A" of the *Gannon I* order. And at the end of the hearing on June 11, 2014, the panel found the legislature had effected such a cure by enacting H.B. 2506, which purported to provide full funding for both capital outlay and supplemental general state aid in fiscal year 2015.

When the panel retracted this order and reopened its equity finding in early 2015, it determined that the legislature had not fully funded but had "otherwise" attempted to cure the inequities through S.B. 7. So the panel concluded it was required to apply the equity test as directed in "Option B" of our order. See 298 Kan. at 1198-99 ("b. If by July 1, 2014, the legislature acts to cure—whether by statutory amendment, less than full restoration of funding to prior levels, or *otherwise*—the panel must apply our test . . . .") (Emphasis added.).

In addition to explicitly stating it would proceed under Option B, the panel quoted the language of the *Gannon I* equity test several times. So we may presume it applied the

proper test. *Rush v. King Oil Co.*, 220 Kan. 616, 624-25, 556 P.2d 431 (1976) (when apparent from the record the district court was aware of proper legal test to be applied, appellate court presumes it applied proper test); see *Unwitting Victim v. C.S.*, 273 Kan. 937, 947, 47 P.3d 392 (2002); *Hegwood v. Leeper*, 100 Kan. 379, 383, 164 P. 173 (1917).

Accordingly, we proceed to the State's main argument—that it cured the inequities affirmed to exist in *Gannon I*. We first address its claim that it has cured the capital outlay funding inequities for fiscal year 2015.

> *The State has not carried its burden to show that it has cured the* Gannon I *capital outlay inequities for fiscal year 2015*.

As we explained in *Gannon I*, "boards of education may adopt a resolution to impose additional mill levies on taxable tangible property in their school districts to exclusively pay for capital improvements such as construction and maintenance of new buildings, as well as for purchase of certain equipment and authorized investments." 298 Kan. at 1176; K.S.A. 2015 Supp. 72-8801; K.S.A. 2015 Supp. 72-8804. The resolution is subject to protest petition, and the mill levy has been capped at 8 mills for the last decade. See K.S.A. 2015 Supp. 72-8801(a), (b); L. 2005, ch. 152, sec. 25(b).

Through the first three quarters of fiscal year 2015, certain districts with lower property wealth were entitled to capital outlay state aid equal to the amount of funds generated from their capital outlay mill levy multiplied by a state aid percentage factor. Before the aid formula was amended, each district's state aid percentage factor was calculated by first determining the median of all districts' assessed property valuation per pupil, *i.e.*, AVPP, in the previous fiscal year, rounded to the nearest $1,000. A state aid computation percentage of 25% was then assigned to the median AVPP. K.S.A. 2014 Supp. 72-8814(b).

38

For every $1,000 a district's AVPP was above the median AVPP, its state aid percentage factor was decreased by 1%. For every $1,000 a district's AVPP was below the median AVPP, its state aid percentage factor was increased by 1%. K.S.A. 2014 Supp. 72-8814(b). So a district with an AVPP at $10,000 below the median AVPP would have a state aid percentage factor of 35%, entitling it to receive capital outlay state aid in an amount produced by multiplying the funds generated by its capital outlay mill levy by 35%. Under this formula, a district's state aid percentage factor could not exceed 100%. K.S.A. 2014 Supp. 72-8814(b); *Gannon I*, 298 Kan. at 1176.

Under the new formula adopted in S.B. 7 on March 25, 2015, for fiscal year 2015 an aid-qualifying district is still entitled to an amount equal to the funds generated from its capital outlay mill levy multiplied by its state aid percentage factor. But S.B. 7 changes how its state aid percentage factor is calculated. Instead of starting at the median AVPP and working up or down from 25%, S.B. 7 moved the starting point to the district having the lowest AVPP rounded to the nearest $1,000. S.B. 7 then set the maximum state aid computation percentage at 75%. L. 2015, ch. 4, sec. 63.

From there, for every $1,000 a district's AVPP is above the lowest district's AVPP, its state aid percentage factor is decreased by 1%. L. 2015, ch. 4, sec. 63. So a district with an AVPP at $10,000 above the lowest AVPP would have a state percentage factor of 65%, entitling it to receive capital outlay state aid in an amount equal to the funds generated by its capital outlay mill levy multiplied by 65%. And when this formula was applied to the four Plaintiff districts, their state aid percentage factors each dropped by 15 percentage points:  Wichita's went from 37% to 22%; Hutchinson's dropped from 50% to 35%; Dodge City's was reduced from 58% to 43%; and Kansas City's fell from 58% to 43%. The State has offered little evidence that explains how these 2015 changes to the capital outlay funding formula complied with *Gannon I*.

Just like the State had called KSDE's Deputy Commissioner Dennis to testify at the June 11, 2014, show cause hearing, it again called him to testify at the May 2015 hearing on the Plaintiffs' motion to alter judgment and motion for declaratory judgment and injunctive relief. Dennis confirmed that the cost of fully funding capital outlay state aid under the old formula had increased by a total of about $18 million since H.B. 2506 was enacted in March 2014—an increase he attributed to some rising property values and some districts' adopting higher capital outlay mill levies in their fiscal year 2015 budgets. Because the aid formulas include property values as a factor, he testified their increase can cause increases in aid.

In its June 26, 2015, opinion and order, the panel found that the legislature had backtracked on its 2014 efforts to comply with the *Gannon I* order when it altered the capital outlay state aid formula during the 2015 session to conform to the amount of funding it wished to provide. The panel concluded that amending the formula failed to cure the wealth-based disparity declared unconstitutional in *Gannon I* because the amendments reduced total capital outlay funding only for the lower-property-wealth districts receiving the aid and left capital outlay levy authority "at full flower" for the districts with higher property wealth and no need for the aid.

In support of its holding, the panel observed: "[P]roperty wealthier districts—those not heretofore receiving capital outlay state aid—remain unscathed, and only those that had demonstrated need are tasked with paying the price of the capital outlay state aid reductions." As a result, it held that for fiscal year 2015, the revised formula failed to comply with our *Gannon I* order. It declared the remaining disparity "does not produce 'reasonably equal access to substantially similar educational opportunity through similar tax effort.'"

The Plaintiffs urge us to affirm the panel's holding, arguing that the reduction in funding under the amended formula exacerbated already existing inequities in the system by reducing capital outlay funding for only "the most vulnerable school districts." The State, on the other hand, contends that the inequities affirmed to exist in *Gannon I* have been cured. It raises two principal arguments in support.

First, the State contends the inequities have been cured because the districts received millions more dollars in capital outlay state aid than they had in previous years. The panel rejected this argument, and so do we. As noted above, we instructed the panel to apply our test to determine whether any remedial action taken by the legislature complied with the equity requirement of Article 6 "through structure and implementation." See 298 Kan. at 1198. Increased capital outlay aid beginning in fiscal year 2015 may have reduced dollar disparities between districts compared to the previous fiscal year but only because the State had completely eliminated funding for capital outlay state aid beginning in fiscal year 2010. See 298 Kan. at 1177. As the Plaintiffs frame it: "The State did not increase the amount of equalization aid to which the districts were entitled—rather, the State *finally* started paying districts the equalization aid to which they were already statutorily-entitled." In short, a mere increase in aid does not necessarily cure unconstitutional inequities. See *Gannon I,* 298 Kan. at 1173.

The evidence supports the Plaintiffs' position. It shows the amended formula when fully funded provides less capital outlay state aid than the previous one would have provided had it been fully funded—*i.e.*, that the amended formula is structurally less equitable. As a result of the amended formula, every district entitled to capital outlay state aid suffered a loss when the legislature reversed its plan to fully fund the previous formula—and 28 districts lost their entire entitlement. In contrast, the wealthier districts that did not qualify for the aid obviously lost nothing. Rather, they received full funding for all of their budgeted capital outlay expenses. So, when we consider what districts

41

would have been entitled to under the previous aid formula, we conclude there is a remaining disparity between them and wealthier, self-funded districts. The question then is whether the legislature's actions resulted in "reasonably equal access to substantially similar educational opportunity through similar tax effort." *Gannon I*, 298 Kan. at 1198.

The State further contends amending the formula in the 2015 legislative session was justified because there was no evidence showing the districts' need for the aid increased after the panel held in 2014 that the inequities had been cured by the funding provided in H.B. 2506. Instead, the State's brief places the blame for the increase in aid due under the previous formula on districts "opportunistically" raising their capital outlay mill levies during the fiscal year 2015 budgeting process in anticipation of full funding of the entitlement.

It is clear from the evidence that many districts lowered their LOB mill levies after the passage of H.B. 2506 and relied upon the increased amount of supplemental general state aid they expected to receive in fiscal year 2015. But instead of eliminating those mills and providing additional property tax relief to their constituents, some of these districts essentially transferred some of their LOB mill levy to their capital outlay mill levy, which increased the latter. This phenomenon occurred in each of the Plaintiff districts. From fiscal year 2014 to 2015, Dodge City raised its capital outlay mill levy from 3.50 to 8, Wichita increased from 4.254 to 8, Kansas City moved from 4.476 to 7.989, and Hutchinson increased from 3.957 to 3.998.

At oral argument before this court, the State admitted that characterizing these increases as "opportunistic" was, perhaps, "indelicate" and agreed the districts had the authority to raise their mill levy under the capital outlay statutes. But the State maintains that because the capital outlay state aid entitlement historically had never exceeded $25 million, its providing $27 million in fiscal year 2015 more than satisfied the districts'

needs. The State argues it was therefore justified in altering the formula to bring the amount of capital outlay state aid closer to the legislature's expectations during the 2014 legislative session before more current data became available. But this argument is unpersuasive.

Contrary to the State's assertion, substantial competent evidence in the record demonstrates that districts' need for capital outlay funds increased as they raised their capital outlay mill levies. As districts were budgeting for fiscal year 2015, they were authorized under K.S.A. 2014 Supp. 72-8801 to levy up to 8 mills for capital outlay expenses. And, according to budget documents in the record, districts with capital outlay expenses budgeted for those expenses and adopted mill levies to help raise funds to pay for them. In other words, the districts eligible for state aid increased their local tax burden in an effort to enhance educational opportunities for their students by accessing the revenue that local tax effort would generate through the combination of local tax dollars and the equalization aid their tax effort provides.

The panel made reasonable inferences that those needs did not vanish when S.B. 7 reduced the amount of capital outlay state aid property-poorer districts expected to receive in fiscal year 2015. It also reasonably inferred that only those less-wealthy districts would have to cut their budgets, raise their mill levy, or divert funds from other sources to pay for their educational needs, resulting in a denial of reasonably equal access to substantially similar educational opportunities through similar tax efforts. This reasoning echoes our analysis in *Gannon I* regarding the total elimination of capital outlay state aid beginning in 2010. There we determined the panel drew a reasonable inference that the aid-qualifying districts' capital outlay needs were ongoing after the total loss of funds, stating: "Once payments have stopped, it logically follows that the inequity the [capital outlay state] aid was originally designed to cure remains present—when, as here, there is no evidence of record demonstrating that the inequity or inequality

43

disappeared on its own." 298 Kan. at 1179 (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1195-96, 221 P.3d 1130 [2009]) (appellate court accepts as true the evidence and all the reasonable inferences drawn from it which support the district court's findings).

That being said, the State's "no need" argument is not particularly relevant in evaluating equity. In this context, equity is not a needs-based determination. Rather, equity is triggered when the legislature bestows revenue-raising authority upon school districts through a source whose value varies widely from district to district, such as with the local mill levy on property.

As our analysis shows, the State has been unable to provide evidence sufficient to show compliance with our *Gannon I* equity order for capital outlay. At oral argument, we expressed doubt about the State's contentions and repeatedly asked its counsel to show the evidence we could rely on to conclude it had cured the constitutional inequity. Despite our invitations, counsel could point us only to spreadsheets of raw data showing the distribution of the money made available, which failed to establish anything other than more money was provided than before. Expressed in the language of our equity test, these spreadsheets did not show that this increase provided students in districts entitled to capital outlay state aid with reasonably equal access to substantially similar educational opportunity though similar tax effort. Therefore, we conclude the State failed to carry its burden to show its alterations to the capital outlay state aid formula for fiscal year 2015 cured the unconstitutional wealth-based disparity affirmed to exist in *Gannon I*. See *Montoy v. State*, 279 Kan. 817, 820, 112 P.3d 923 (2005) (*Montoy III*) (State carries burden in remedy phase).

In contrast to the State's lack of evidence supporting its purported cure, the Plaintiffs presented evidence relevant to the equity question, even though they had no burden to show the State failed to comply with our order to cure the wealth-based

44

disparity from *Gannon I*. Specifically, the Plaintiffs presented testimony at the panel's May 7-8, 2015, hearing from the Hutchinson and Kansas City superintendents. Each explained how S.B. 7 negatively impacted their budgets and required them to make cuts in fiscal year 2015 and revise their long-term funding strategies. Specific to the effect of the reduced capital outlay funding, Dr. Cynthia Lane, Superintendent of the Kansas City district, testified and supplied an affidavit stating that her district had to defer maintenance, including roof replacement and repair, concrete and asphalt repair, plumbing and sheet metal replacement, asbestos abatements, HVAC upgrades, boiler replacements, and replacement of aging ceilings, floors, doors, and locks.

The State complains no evidence was presented at this hearing that would have allowed the panel to assess districts' relative ability to provide substantially similar educational opportunities. We acknowledge there was no testimonial evidence that would have allowed the panel to assess relative educational opportunities statewide. The Hutchinson and Kansas City superintendents only testified about the impact of S.B. 7 on their own districts. But the Plaintiffs did introduce exhibits providing calculations prepared by KSDE that showed each of the districts entitled to capital outlay state aid would receive less funding under the revised formula than they would have received under the previous one. And these exhibits also showed that the wealthier districts with no aid entitlement suffered no loss.

This contrast between wealthier and poorer districts is amply demonstrated in the Plaintiffs' proposed findings of fact on the issue of capital outlay, which the panel adopted. There, the Plaintiffs compared funding levels between the Turner-Kansas City and South Barber districts. In fiscal year 2015, both districts levied 8 mills locally for capital outlay funds. Of all the districts at the 8-mill level, the Turner-Kansas City district had the lowest AVPP and the South Barber district had the highest. Under the old formula's full funding, Turner-Kansas City would have received about $1.5 million in

capital outlay funds from its combined local mill levy and capital outlay state aid. But under the new formula, it lost about $140,000 in capital outlay state aid, which likely forced it to look at other areas to cover this loss, *e.g.*, diversion of funds allocated for other budget items. By contrast, South Barber, which received no state aid and therefore was unaffected by the alterations to the formula, obviously suffered no loss. It was permitted to keep the total amount of funds the legislature allowed it to raise from its capital outlay mill levy—about $848,000.

The significance of this comparison is more apparent when each district's total capital outlay funds are presented as dollars per pupil. Under the old formula, Turner-Kansas City, which has about 4,000 students, would have received $379 per pupil in total capital outlay funds—its mill levy funds plus aid. Under the new one, it received $347 per pupil while South Barber's capital outlay mill levy alone raised about $3,600 per pupil.

Wealth-based disparities have always existed in districts' ability to raise capital outlay funds. Historically, the districts with the most property wealth were able to raise more capital outlay funds than the ones with lower property wealth. But by reducing the capital outlay funding that adversely impacted only the lower-property-wealth districts, the 2015 legislature widened the gap between districts receiving the aid and those without a need for it.

This same basic problem was evident in the first phase of the litigation. At that time, we reasoned that for the analogous area of supplemental general state aid, "the State's proration of the equalizing payments has made it even more difficult for those districts with lower property wealth to obtain reasonably equal access to substantially similar educational opportunity through similar tax effort." *Gannon v. State*, 298 Kan. 1107, 1187, 319 P.3d 1196 (2014) (*Gannon I*). The panel raised a similar point

46

concerning capital outlay funding in its June 2015 order, reasoning that totally eliminating capital outlay state aid—which we ruled unconstitutional in *Gannon I*—versus merely prorating it represented "a distinction without a difference." Under these circumstances, *i.e.*, where only lower-property-wealth districts entitled to the aid lost capital outlay funding, we agree.

Just as the State presented no evidence to support its purported cure of the capital outlay aid inequities, it can point to no evidence that refutes these losses or otherwise justifies them as a means to demonstrate compliance with *Gannon I*. Because it carries the burden in the remedial stage to show that districts had reasonably equal access to substantially similar educational opportunity through similar tax effort, this continued lack of evidence compels us to conclude it has not met that burden. In sum, we affirm the panel's holdings that the legislature failed to cure the wealth-based disparities affirmed to exist in *Gannon I* involving capital outlay funding for fiscal year 2015.

> *The State has not carried its burden to show it has cured the* Gannon I *supplemental general state aid inequities for fiscal year 2015*.

For more than 20 years under the SDFQPA, a local school board could adopt a local option budget (LOB) by resolution in each school year to supplement its funding through additional mill levy. The district's LOB-generated funds could not exceed the amount calculated by using a state-prescribed percentage—commonly referred to as the "LOB cap"—which was set by the 2014 legislature at 31% of the district's state financial aid entitlement, calculated as if the BSAPP was set at $4,490. K.S.A. 2014 Supp. 72-6433(a)(1), (b); K.S.A. 2014 Supp. 72-6433d(a)(3). Generally, to adopt an LOB in excess of 30%, the board's resolution had to be approved by a majority of qualified electors in the district. K.S.A. 2014 Supp. 72-6433(e)(1).

But for fiscal year 2015, the 2014 legislature authorized districts that had adopted an LOB in excess of 30% on or before June 30, 2014, to adopt a second resolution to increase its LOB by up to 2% without voter approval. The amount authorized in both resolutions together was capped at 33%. K.S.A. 2014 Supp. 72-6433(e)(2).

Historically, less wealthy districts adopting an LOB could also qualify for, and receive from the State, supplemental general state aid. Before the legislature amended the formula in March 2015, the State provided supplemental general state aid to districts that had an AVPP under the 81.2 percentile of statewide AVPP. The amount of aid was determined by multiplying the amount of a district's LOB-generated funds by a ratio obtained from dividing the AVPP of the district by the AVPP at the 81.2 percentile and subtracting the quotient from 1. See K.S.A. 2014 Supp. 72-6434(a). In contrast to capital outlay state aid, the purpose of supplemental general state aid was to benefit qualifying districts by lowering their mill levies, not by increasing their total revenues.

The revised formula under S.B. 7 created by the 2015 legislature retains features of the previous one, *i.e.*, the amount of a district's LOB funds is multiplied by the ratio obtained from dividing the AVPP of the district by the AVPP at the 81.2 percentile and subtracting the quotient from 1. But the revised formula then adds extra steps. All districts below the 81.2 percentile of statewide AVPP must be divided into five equal groups, or quintiles. And the calculated entitlement is then reduced according to the quintile into which a district falls. Districts in the lowest quintile—*i.e.*, those with the lowest property wealth—receive 97% of the product obtained by multiplying the amount of a district's LOB funds by its AVPP ratio. Similarly, districts in the second lowest quintile receive 95%; districts in the middle quintile receive 92%; districts in the second highest quintile receive 82%; and districts in the highest quintile receive 72%. L. 2015, ch. 4, sec. 38. So the higher a qualifying district's property wealth, the greater the

48

reduction in supplemental general state aid under the revised formula. The State has offered no evidence that explains how these changes complied with *Gannon I*.

At the panel's May 2015 hearing, KSDE's Deputy Commissioner Dennis confirmed that an additional $35 million would have been required to fully fund the prior supplemental general state aid formula—*i.e.*, without the reductions required by the new quintiles provisions. He testified that after H.B. 2506 was enacted during the 2014 legislative session, school districts began preparing their fiscal year 2015 budgets using the property valuation data for fiscal year 2014 that had not been available during the previous legislative session. According to Dennis, the entitlement increased as a result of a significant rise in AVPP at the 81.2 percentile caused by increased property values in certain districts. Some districts also increased the percentage of their authorized LOBs, which independently created an increase in supplemental general state aid entitlements for qualifying districts.

The panel found that KSDE's original estimate was "short of the reality." And, as with capital outlay state aid, it concluded the legislature had revised the formula simply to conform to the amount of money it wished to provide. Ultimately, the panel held that the $35 million reduction in supplemental general state aid for fiscal year 2015 "leaves a constitutionally unacceptable wealth-based disparity between [districts] deemed without a need for such aid and those that have that need." It reasoned that because of the changes to the formula,

> "[n]ow only those [districts] eligible to receive supplemental general state aid for FY2015
> . . . are expected to summarily shuffle or abandon these needs, yet those [districts] that
> had no need for such aid, yet likewise budgeted in the best interest of their students
> locally, have had their choices honored."

Consequently, it held that the State had failed to comply with our order to cure the supplemental general state aid inequities affirmed to exist in *Gannon I*. That is, the legislature had failed to accord "reasonably equal access to substantially similar educational opportunity through similar tax effort." See 298 Kan. at 1175.

The Plaintiffs' arguments on appeal echo the panel's holdings. They concentrate on the difference in funding that districts would have received had the previous supplemental general state aid formula been fully funded and what they actually received under S.B. 7. The State contends, though, that the additional funds were not necessary to preserve the panel's 2014 finding of compliance with the *Gannon I* order—*i.e.*, that the inequities remained cured despite the loss of funds.

In support of this point, the State first argues that the panel placed too much emphasis on the discrepancy in funding between the two formulas and that S.B. 7 only marginally reduced the amount of aid that would have been due to the Plaintiff districts under the previous formula. It instead emphasizes that the amount of supplemental general state aid provided in fiscal year 2015 was greater than the previous years' funding. We rejected this argument regarding capital outlay state aid and reject it again here for the same reasons.

We next address a related point raised by the State: that providing $109 million more in aid allowed the districts entitled to it to lower their LOB mill levies in fiscal year 2015, thus making their local tax efforts more similar to wealthier districts'. Admittedly, substantial competent evidence in the record indicates that each of the Plaintiff districts was able to lower its LOB mill levy substantially between fiscal years 2014 and 2015. For example, the Kansas City and Wichita districts both have an authorized LOB of 30%. In fiscal year 2015, Kansas City lowered its LOB mill levy from 30.994 to 13.396 mills and Wichita lowered its from 25.2 to 16.212 mills. In comparison, the average mill levy

50

for all districts with an authorized LOB of 30% receiving no supplemental general state aid was 13.958 mills. And the average mill levy for all districts at 30% was 17.002 mills.

The results were similar in Dodge City and Hutchinson, which have authorized LOBs below 30%. Dodge City's LOB is approximately 29%, and it lowered its mill levy from 30.446 to 16.636 mills in fiscal year 2015. Hutchinson's LOB is approximately 28%, and it lowered its mill levy from 22.871 to 13.419 that year.

Districts' relative local tax efforts obviously became more similar with the $109 million increase in supplemental general state aid legislatively provided beginning in fiscal year 2015. But while the gap in tax effort has been decreased, through CLASS's aid-reducing quintile provisions the State continues to deprive certain districts of some LOB-based funds while allowing others to remain at previous funding levels. Accordingly, it has still ultimately made it more difficult for aid-receiving districts to provide substantially similar educational opportunities through tax efforts similar to their wealthier counterparts. See 298 Kan. at 1175.

The State offers one additional argument to support its claim that the wealth-based disparity in LOB funding has been returned to a constitutionally acceptable level. It claims that, regardless of the losses in supplemental general state aid between the previous and amended formulas, the legislature was still justified in revising the formulas because there is no substantial competent evidence in the record showing the districts' need for supplemental general state aid increased after the panel determined in 2014 the State had complied with our *Gannon I* orders. Instead, it contends the additional aid required under the previous formula was solely attributable to a temporary spike in AVPP—assessed property valuation per pupil—at the 81.2 percentile, which "artificially inflated" the entitlement. Similar to the conclusion we reached above regarding the State's

"no need" capital outlay argument, we find its "no need" LOB argument to be unconvincing.

We first address the State's point regarding the rise in AVPP at the 81.2 percentile. As previously explained, both the previous and amended supplemental general state aid formulas are partly driven by property values and require each district's AVPP to be compared to the AVPP at the 81.2 percentile. At the May 2015 hearing, Deputy Commissioner Dennis testified that the aid due under the previous formula increased in part because AVPP at the 81.2 percentile had risen "significantly" between fiscal years 2013 and 2014. During that time, AVPP at the 81.2 percentile rose from $109,257 to $116,700—a total increase of $7,443. He explained that this increase was caused by spikes in property valuation in oil- and gas-rich districts during fiscal year 2014. But he believed the valuations would go back down in 2015.

The panel observed in its June 26, 2015, opinion that property valuations have historically fluctuated both up and down. This observation is supported by an exhibit in the record showing AVPP at the 81.2 percentile for fiscal years 2010 through 2014. For example, in fiscal year 2011, AVPP at the 81.2 percentile increased $4,896 over fiscal year 2010 and in fiscal year 2012 it increased an additional $6,067. In fiscal year 2013, however, AVPP at the 81.2 percentile decreased from the previous year by $1,038.

And contrary to Dennis' prediction, after property valuations increased in fiscal year 2014 to raise the relevant AVPP another $7,443, they did not decline in fiscal year 2015. Rather the AVPP at the 81.2 percentile increased by another $6,989 to $123,689. So the recent increase in AVPP at the 81.2 percentile does not appear to be a fluke, as the State suggests. Regardless of the reason, it is undisputed that rising property values contributed to a higher AVPP at the 81.2 percentile and, consequently, caused an increase in the amount of supplemental general state aid due under the previous formula.

52

The $109 million appropriated by the 2014 legislature's H.B. 2506 to try to fully fund supplemental general state aid for fiscal year 2015 was based on estimates provided by KSDE using the most current data available at that time. But the State was fully aware that this was 2013 data and the final number would likely change once the actual valuation data used in the formula became available and districts submitted their 2015 budgets. Indeed, even before the panel's finding of substantial compliance at the end of the June 11, 2014, hearing, Dennis revealed that the AVPP at the 81.2 percentile would increase more than $7,000 from $109,257 to $116,700. He also warned that some districts could, and likely would, raise their authorized LOB percentages in fiscal year 2015—which for state aid-qualifying districts could increase their entitlements. Many districts, including each of the four Plaintiff districts, proved him correct and raised their LOBs in fiscal year 2015: Kansas City increased from 28.93% to 30%, Hutchinson went from 27.75% to 28.68%, Wichita increased from 29.66% to 30%, and Dodge City went from 29.48% to 29.88%.

Even though the State's counsel informed the panel in June 2014 that the legislature was aware that the final amount of aid might change once the actual numbers became available, the State now attempts to equate all districts' needs based on the estimates in 2014 with their needs based on the reality of their 2015 budgets. Logically, a district identifies its needs in any given fiscal year, adopts an LOB to help fund them, and sets its LOB percentage accordingly. Consequently, a district that sets its LOB at 30% does so because it has determined it needs that amount of resultant funds. Not surprisingly, it budgets for expenses to be paid with those funds.

In fiscal year 2015, a district with a 30% LOB receiving no supplemental general state aid would have obtained sufficient funding from its local mill levy to cover all of the budget expenses it had identified to be paid from its LOB-generated funds. But, due to

53

the reductions in supplemental general state aid under the new formula, an aid-qualifying district with a 30% LOB would have lost some of its total LOB funding, creating an inability to cover some of the expenses it had planned to pay with its LOB-generated funding. As the panel observed, there is no evidence showing these expenses disappeared once the districts entitled to the aid lost some of their LOB funding. Accordingly, with approximately 3 months left in their fiscal year, these districts would have been required to take remedial action, *e.g.*, cut their budgets or divert funding from other sources to cover their losses—a hardship not suffered by wealthier, self-funded districts. So we find substantial competent evidence in the record showing districts had a greater need for supplemental general state aid in fiscal year 2015 than the legislature provided. This in turn shows a disparity between the tax effort exerted and the resulting educational opportunities denied.

As with capital outlay, we again note that the State's arguments regarding districts' needs are not particularly relevant in assessing equity. While changes in AVPP may not be a strong indicator of what is necessary to adequately fund public education, fluctuating AVPPs do substantially impact equity when the legislature grants school districts revenue-raising authority via a local property tax. Under the previous formula, wealth-based disparities among districts were reduced by providing sufficient aid to bring all districts residing below the 81.2 percentile to that level. When AVPP at the 81.2 percentile increases, it is accordingly necessary to increase supplemental general state aid to keep districts with lower property wealth at that level. By not providing the increased aid, the legislature has dropped the districts residing below the 81.2 percentile even further from the wealthier districts residing above it that can raise their budgeted LOB funds exclusively through their local mill levies.

Accordingly, we conclude the State failed to carry its burden to show its alterations to the supplemental general state aid formula cured the unconstitutional

wealth-based disparity previously affirmed to exist in *Gannon I*. See *Montoy v. State*, 279 Kan. 817, 820, 112 P.3d 923 (2005) (*Montoy III*) (State carries burden in remedy phase).

We additionally observe there is substantial competent evidence in the record provided by the Plaintiffs—who again had no burden to provide any evidence in this remedial phase—showing that the State failed to cure these supplemental general state aid inequities identified in *Gannon I*. Specifically, Hutchinson Superintendent Dr. Shelly Kiblinger testified at the May 2015 hearing that her district was forced to make budget cuts in the wake of S.B. 7's reduced funding for such aid. She also provided an affidavit declaring that her district was in the process of cutting various personnel positions, including 1 high school and 3 elementary school teachers, 3 elementary instructional coaches, a librarian, a maintenance position, and a secretarial position. According to Kiblinger, these cuts were directly related to the reductions in supplemental general state aid under S.B. 7.

The Plaintiffs also introduced exhibits containing calculations prepared by KSDE. They showed that each of the districts receiving supplemental general state aid—*i.e.*, those below the 81.2 percentile—would receive less in fiscal year 2015 than they would have received under the previous formula. The districts above the 81.2 percentile, however, would continue to receive their full LOB funding.

For example, the Kansas City, Wichita, and South Barber districts each had an authorized LOB of 30% in fiscal year 2015. Under the previous funding formula, each would have received $1,347 per pupil in total LOB funding that year. Of that amount Kansas City, which has the lowest AVPP of the three, would have received $964 per pupil in supplemental general state aid. Wichita, which has an AVPP in the middle range of all districts below the 81.2 percentile, would have received $717 per pupil in such aid. South Barber, which has one of the highest AVPPs in the State, would have received no

supplemental general state aid. So the $1,347 would have come entirely from its local mill levy.

But Kansas City and Wichita—and all other districts below the 81.2 percentile—lost some of their aid entitlement under the new formula. Kansas City is in the lowest quintile, so it received 97% of the aid it would have received under the previous formula—*i.e.*, $935 per pupil instead of $964. Combined with the funds generated by its LOB mill levy, Kansas City received a total of $1,318 per pupil in LOB funding—down from $1,347. Wichita took a bigger loss because it resides in the middle quintile. Its aid entitlement was reduced to 92% of what it would have been under the previous formula—*i.e.*, $660 per pupil instead of $717. So it received a reduced total of only $1,290 per pupil in LOB funding. By contrast, South Barber lost nothing under the revised formula. Its local mill levy still easily raises the full $1,347 per pupil it would have raised under the previous funding system.

We acknowledge we have never required absolute equality of funding among districts. See *Gannon v. State*, 298 Kan. 1107, 1175, 319 P.3d 1196 (2014) (*Gannon I*) ("equity need not meet precise equality standards"). But consistent with our conclusion regarding the reductions in capital outlay state aid under S.B. 7, by reducing the supplemental general state aid to affect only lower-property-wealth districts, the legislature has increased the wealth-based disparity between those districts receiving the aid and wealthier districts ineligible to receive it, *i.e.*, it has widened the existing gap between them. Therefore, we hold the panel's findings are supported by substantial competent evidence and we affirm their conclusions. We hold the State has failed to carry its burden in the remedial phase to show that it has cured the inequities affirmed to exist in *Gannon I* involving supplemental general state aid. Stated another way, it did not show that the districts had reasonably equal access to substantially similar educational opportunity through similar tax effort in fiscal year 2015.

56

But our inquiry does not end here. Because the 2015 legislature repealed the existing school funding system for fiscal years 2016 and 2017 and replaced it with CLASS, we must also analyze whether those new provisions cure the inequities affirmed to exist in *Gannon I*. The panel discussed CLASS at length in its June 2015 memorandum opinion and order and concluded it violated both the adequacy and equity requirements of Article 6. We address only its equity holdings here—*i.e.*, those related to capital outlay and supplemental general state aid. We begin with CLASS's capital outlay provisions.

*The State has not carried its burden to show it has cured the* Gannon I *capital outlay inequities through CLASS.*

In fiscal years 2016 and 2017, districts retain their authority to levy up to 8 mills for capital outlay under S.B. 7. See L. 2015, ch. 4, secs. 63, 79. But instead of aid-qualifying districts receiving capital outlay state aid as newly calculated per any formula, they receive "an amount equal to . . . the amount of capital outlay state aid such school district received for school year 2014-2015, if any, pursuant to K.S.A. 2014 Supp. 72-8814, prior to its repeal . . . ." L. 2015, ch. 4, sec. 6(a)(3). So even if an aid-qualifying district raises its capital outlay mill levy above its 2015 level, *i.e.*, increases its tax burden, or even if its property values increase, it will not receive any additional aid because CLASS freezes the funds at the 2015 amount. See L. 2015, ch. 4, secs. 6(a), 79.

After the panel held the reduced funding provided under the revised formula in fiscal year 2015 failed to comply with the *Gannon I* equity order, it further determined that because CLASS froze capital outlay state aid at the 2015 level and carried forward that loss into the next 2 fiscal years, the capital outlay provisions in CLASS also failed to comply. The panel additionally criticized CLASS's failure to provide more capital outlay state aid above the 2015 entitlement to those districts choosing to raise their capital outlay mill levies above the 2015 level for fiscal year 2016 or 2017.

The Plaintiffs obviously agree with the panel's holdings and urge us to affirm. The State generally argues, however, that it cured the inequities. It contends that any reduction in aid was relatively minimal and did not impact educational opportunity. Moreover, it claims districts could overcome funding losses either by raising their local capital outlay mill levies or applying to the State Finance Council for extraordinary need state aid. It also argues that because no evidence shows any district would actually raise its capital outlay mill levy above the 2015 level, the panel's concern about the State's failure to provide any aid above the 2015 level was merely speculative.

In our analysis regarding funding of capital outlay state aid and supplemental general state aid for fiscal year 2015, we twice rejected the State's argument that S.B. 7 resulted in only a "relatively minimal change in aid." For the reasons discussed above, we reject it here. The panel's concerns regarding both types of aid under the SDFQPA in fiscal year 2015 and CLASS in fiscal years 2016 and 2017 clearly were not focused on the amount of funding lost under the new formula but on the realization that the losses only affected one subset of districts—*i.e.*, those with lower property wealth entitled to either type of aid. So the State's argument is again unpersuasive. Accordingly, we decline to address the State's contention that local mill levies could be raised by the districts. We also decline to address its contention that the limited amount of extraordinary need state aid might be used to successfully mitigate the loss of funds—if the State Finance Council acted within its sole discretion to allocate from a fund essentially financed in part by state aid taken from some of the very districts which now request assistance.

The record contains little information for fiscal years 2016 and 2017 because data for those years was not yet available at the May 2015 hearing. But without this data, the panel still had to consider how the legislative changes were likely to impact districts for the next 2 years in order to apply the equity test prospectively. And we conclude that,

after the panel applied our test and determined the fiscal year 2015 capital outlay provisions failed to cure the inequities affirmed to exist in *Gannon I*, the panel reasonably inferred that by freezing that already inequitable funding and carrying it into the next 2 fiscal years, the equity test had not been met for those years either. See *Gannon I*, 298 Kan. at 1179 (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1195-96, 221 P.3d 1130 (2009) (appellate court accepts as true the evidence and all the reasonable inferences drawn from it which support the district court's findings). Accordingly, we affirm the panel.

*The State has not carried its burden to show it has cured the* Gannon I *supplemental general state aid inequities through CLASS.*

Effective July 1, 2015, S.B. 7 repealed K.S.A. 2014 Supp. 72-6433, which had previously authorized districts to adopt LOBs and set out the accompanying procedures. But CLASS—much as the SDFQPA had—still grants each district the authority to adopt an LOB in fiscal years 2016 and 2017, to assess a mill levy on the taxable tangible property of the district, and to receive those funds generated by this local effort. L. 2015, ch. 4, secs. 12-13. To raise its LOB percentage above the fiscal year 2015 level, however, a district had to adopt a higher LOB before July 1, 2015—the beginning of fiscal year 2016.

S.B. 7 also repeals the supplemental general state aid formula that had been amended for fiscal year 2015. See L. 2015, ch. 4, secs. 80-81. And instead of providing such aid in fiscal years 2016 and 2017 based on the formula, the state now distributes through CLASS "an amount equal to . . . the amount of supplemental general state aid each school district received for school year 2014-2015 . . . ." L. 2015, ch. 4, sec. 6(a)(2). Accordingly, even those districts that raised their LOB before July 1, 2015, are not entitled to any additional supplemental general state aid because the funds provided in CLASS for fiscal years 2016 and 2017 are frozen at the 2015 amount.

The panel found that the legislature reduced the amount of supplemental general state aid provided in fiscal year 2015 and failed to provide additional supplemental general state aid for fiscal years 2016 and 2017 to those districts that chose to increase their LOBs before July 1, 2015. As a result, it concluded that "the condition created overall [in S.B. 7 regarding supplemental general state aid]—and particularly its retroactive and carryover features—[represents] a clear failure to accord 'school districts reasonably equal access to substantially similar educational opportunity through similar tax effort.'" See *Gannon I*, 298 Kan. at 1198. Accordingly, the panel also held that the State had failed to comply with our order to cure those inequities affirmed to exist in *Gannon I*. It reasoned that the disparity it found in fiscal year 2015 would carry forward through fiscal year 2017 and would

> "likely . . . be exacerbated by the potential for increases in LOB authority for some, whereby the increasingly tax-wealthy districts will have their educational goals honored, preserved, and funded, including decisions in regard to holding cash reserves, while those needing aid will be at the burden of increased, but unsubsidized, taxation as their price of increased budgeting choice. Such choices, if made, will be borne by these local taxpayers alone."

The Plaintiffs generally contend the panel reached the correct result. The State raises the same basic arguments it made regarding capital outlay aid, *i.e.*, that (1) the panel reached the wrong result, (2) any change in supplemental general state aid was "relatively minimal" and could be mitigated by raising local mill levies or applying for extraordinary need state aid, and (3) there is no evidence showing any aid reductions would impact districts' access to substantially similar educational opportunity.

For the reasons previously stated, we again reject the State's argument concerning the "relatively minimal" loss of funds. We also decline to address the possibility of

raising local mill levies or receiving sufficient amounts of discretionary extraordinary need state aid to cover such a loss. We again acknowledge the State's valid assertion that the panel's concerns about districts raising their LOBs above 2015 levels are not supported by hard data in the record. But, as with the lack of specific data regarding capital outlay state aid for fiscal years 2016 and 2017, the lack of specific data regarding supplemental general state aid for those years could not preclude the panel's consideration of the prospective legislation for compliance with our orders.

We conclude that—because CLASS fails to provide additional supplemental general state aid even to those districts that chose to obtain more funds through their own efforts by increasing their LOBs before July 1, 2015—the panel made a reasonable inference that districts with "no need for such aid are able to generate sufficient tax revenues with less tax levy while those needing such aid will require a greater tax levy to just stay even." See *Gannon I*, 298 Kan. at 1179 (accepting as true reasonable inferences drawn from evidence supporting district court's findings). The panel's conclusion echoes this court's reasoning in *Montoy III*.

In *Montoy III*, this court evaluated changes made to the school funding system during the 2005 legislative session. The legislature raised the LOB cap from 25% to 27% for fiscal year 2006 but failed to provide supplemental general state aid for the additional 2%. The court held that failure to provide additional equalization funds above the former 25% cap exacerbated disparities among districts because all funds beyond the former cap would have to come solely from each district's property tax base. 279 Kan. at 833-34. We approved this rationale in *Gannon I* when we drew an analogy between the failure to provide any supplemental general state aid over 25% and the legislature's proration of all supplemental general state aid beginning in fiscal year 2010. See 298 Kan. at 1188 (noting both actions had "the same basic effect" and were both constitutionally inequitable). The same reasoning applies here:  The legislature's failure to provide

additional supplemental general state aid for any LOBs increased before July 1, 2015, exacerbates wealth-based disparities between districts in the future and does not comply with our order in *Gannon I*.

We agreed with the panel's reasoning that the distribution of supplemental general state aid under S.B. 7's amended formula in fiscal year 2015 did not comply with the *Gannon I* order because it disproportionately impacted districts below the 81.2 percentile. So we logically conclude that S.B. 7's freezing of supplemental general state aid at the fiscal year 2015 level for fiscal years 2016 and 2017 also does not comply. *Cf. Gannon I*, 298 Kan. at 1179 ("Once payments have stopped, it logically follows that the inequity the equalization aid was originally designed to cure remains present . . . .").

Issue 4: *The Plaintiffs are not entitled to attorney fees.*

In *Gannon I*, we affirmed the district court's denial of the Plaintiffs' request for attorney fees made during the initial litigation phase. 298 Kan. at 1196. Here in the remedial phase, the Plaintiffs make a new claim for attorney fees before this court. But this request is procedurally deficient and must be denied.

We can find nothing in the record showing the Plaintiffs raised this claim with the panel on remand. As a general rule, matters not raised before the district court cannot be raised for the first time on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 403, 266 P.3d 516 (2011); see also *Karle v. Board of County Commissioners*, 188 Kan. 800, 805, 366 P.2d 241 (1961) (applying general rule to request for attorney fees made for the first time on appeal). Moreover, the Plaintiffs' request is not so narrowly drawn that it can be interpreted as a request for only appellate attorney fees under Supreme Court Rule 7.07(b) (2015 Kan. Ct. R. Annot. 72), which authorizes this court to award attorney fees for services on appeal if the district court had the authority to award such fees. And, even

if we could interpret the Plaintiffs' request in that light, they have not filed a motion for attorney fees and supporting affidavit as required under that rule. Accordingly, we will not consider the merits of the Plaintiffs' claim. Their request for attorney fees is denied.

Issue 5: *The courts are endowed with remedial powers to enforce their holdings.*

As mentioned, the panel's remedial orders of June 26, 2015, begin with a declaration that S.B. 7 violates Article 6's adequacy and equity requirements. Despite these holdings, it declined to strike S.B. 7 in its entirety. Instead, the panel entered a declaratory judgment on adequacy and a series of remedial orders on equity.

These orders were intended to serve as a temporary fix until the issue of adequacy could be later resolved on appeal. They were designed to be implemented immediately in an effort to provide additional funding for fiscal year 2015—which would end several days later on June 30—and to alleviate uncertainty in the districts' budgeting process for fiscal year 2016—which would begin July 1.

The Plaintiffs argue these remedies are appropriate and urge us to lift the stay we placed on the panel's orders in June 2015. See Supreme Court Order, June 28, 2015. In the alternative, they ask us to impose an immediate remedy to cure the inequities in the current funding system.

By contrast, the State contends the panel's remedies are improper because they violate equitable principles and the separation of powers doctrine. The State further argues the panel abused its discretion in entering its temporary restraining order and that our remedy should be limited to a declaratory judgment giving the legislature an opportunity to cure any constitutional violations on its own.

*Power to review and impose remedies*

We begin the analysis of these arguments by reaffirming the legislature's power and duty to create a school funding system that complies with Article 6 of the Kansas Constitution. See *Gannon I*, 298 Kan. at 1146 (language of Article 6 both empowers and obligates the legislature to make suitable provision for finance of the educational interests of the state); *U.S.D. No. 229 v. State*, 256 Kan. 232, 251-53, 885 P.2d 1170 (1994) (legislature has responsibility to finance educational interests of the state).

Just as we have affirmed this constitutional power and duty of the legislature, we have also consistently affirmed our own power and duty to review legislative enactments for constitutional compliance and to enforce our holdings, as explained below.

We initially observe that more than 100 years ago this court recognized that "Constitutions are the work, not of legislatures or of the courts, but of the people." *Anderson v. Cloud County*, 77 Kan. 721, 732, 95 P. 583 (1908); accord *Gannon I*, 298 Kan. 1142. Consequently, we have recognized the Kansas Constitution "is the supreme and paramount law, receiving its force from the express will of the people." *Moore v. Shanahan*, 207 Kan. 645, 651, 486 P.2d 506 (1971). As former Kansas Attorney General Harold Fatzer explained after becoming a justice on this court: "The Constitution is the work of the people—it declares their will—and those who would disobey its provisions, instead of disobeying the people, are in fact disregarding and defying their will." *Moore*, 207 Kan. at 679 (Fatzer, J., concurring in part and dissenting in part).

In their constitution, the people of Kansas established the legislative, executive, and judicial branches of government and divided powers among them, *i.e.*, creating a separation of powers. *Gannon I*, 298 Kan. at 1119. In 1903 the Kansas Supreme Court reviewed the separation of powers issue and asked whether the court should obey the

legislature—or the people: "The constitution is the direct mandate of the people themselves. The statute is an expression of the will of the legislature. Which shall this court obey?" *Atkinson v. Woodmansee*, 68 Kan. 71, 75, 74 P. 640 (1903). Quoting from the United States Supreme Court's decision in *Marbury v. Madison*, 5 U.S. [1 Cranch] 137, 177, 2 L. Ed. 60 (1803), the court ultimately concluded that it must obey the will of the people as expressed in their constitution.

In reaching this conclusion, the *Atkinson* court of 1903 quoted extensively from Alexander Hamilton's Federalist Paper No. 78 of 1788. In foreshadowing the power of constitutional review later expressed by the United States Supreme Court in *Marbury v. Madison*, Hamilton first established it is the duty of the courts to declare as void all legislative acts contrary to the Constitution: "'Limitations [on legislative authority] can be preserved in practice no other way than through the medium of the courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the constitution void.'" *Atkinson*, 68 Kan. at 82.

Hamilton then acknowledged the concern that the judicial authority to declare legislation unconstitutional would imply that the courts were superior to the legislature. In response, he explained that the rationale underlying this authority arose from a very basic principle, *i.e.*, the representatives of the people are not superior to the people themselves:

> "'There is no position which depends on clearer principles than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. *No legislative act, therefore, contrary to the constitution, can be valid. To deny this would be to affirm that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves*; that men acting by virtue of powers may do not only what their powers do not authorize, but what they forbid.'" (Emphasis added.) *Atkinson*, 68 Kan. at 82-83.

Hamilton went on to explain that to instead allow the legislature the authority to judge the validity of its own laws would enable its members to substitute their will for their constituents'. Accordingly, he reasoned that the courts were created by the people to stand between the people and the legislature—*i.e.*, to help keep the legislature within the limits of its authority granted by the people:

> "'It is not . . . to be supposed that the constitution could intend to enable the representatives of the people to substitute their will to that of their constituents. It is far more rational to suppose that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority.'" *Atkinson*, 68 Kan. at 83.

Hamilton further instructed that the intent of the people, as contained within their Constitution, should be preferred to the intent of their legislative agents, as contained in their enactments. And this determination of the people's intent should be made by the courts:

> "'*The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be, regarded by the judges, as a fundamental law. It must therefore belong to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body*. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought, of course, to be preferred; or, in other words, *the constitution ought to be preferred to the statute, the intention of the people to the intention of their agents*.'" (Emphasis added.) *Atkinson*, 68 Kan. at 83.

Finally, Hamilton explained that this structure did not exalt the judicial over the legislative. Rather, it simply acknowledged the power of the people over both branches—and the people's Constitution should govern the courts when it conflicted with legislation. He declared this conclusion

"'*only supposes that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the constitution, the judges ought to be governed by the latter rather than the former.* They ought to regulate their decisions by the fundamental laws rather than by those which are not fundamental.' (The Federalist, Hamilton edition, 576-578.)" (Emphasis added.) *Atkinson*, 68 Kan. at 83-84.

After this exposition, the *Atkinson* court confirmed the Kansas Supreme Court's authority to review legislative enactments for constitutional compliance and to declare a legislative act unconstitutional, *i.e.*, in opposition to the will of the people. In doing so, the *Atkinson* court reaffirmed a principle first recognized by this court in 1870:  "'It is emphatically the province and duty of the judicial department to say what the law is.'" 68 Kan. at 91; see *Auditor of State v. A.T. & S.F. Railroad Co.*, 6 Kan. 500, 506, 1870 WL 507 (1870) (quoting *Marbury*, 5 U.S. [1 Cranch] 137).

So the judiciary clearly has the power to review a law and potentially declare it unconstitutional. But this power is not limited solely to review. It also includes the inherent power to enforce our holdings. See *Schoenholz v. Hinzman*, 295 Kan. 786, Syl. ¶ 10, 289 P.3d 1155 (2012) (courts have inherent equitable powers to fashion remedies and impose sanctions); *State v. Holt*, 290 Kan. 491, 497, 232 P.3d 848 (2010) (court's inherent powers may be exercised as a means of enforcing obedience to a law which the court is called on to administer); *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 894, 179 P.3d 366 (2008) (recognizing Kansas judiciary's inherent remedial powers:  "[T]o enforce a positive right, courts must mandate a positive remedy by requiring the state government to act and thereby fulfill the constitutional right."); *State v. Montoy*, 279 Kan. 817, 828-29, 112 P.3d 923 (2005) (*Montoy III*) (active judicial role in monitoring remedy formulation is well-rooted in the courts' equitable powers); *State v. Brady*, 156 Kan. 831, 841, 137 P.2d 206 (1943) ("[I]t is well settled that courts have inherent powers . . . to effectuate the functions and duties imposed upon them."); *C.K. & W. Rld. Co. v. Comm'rs*

67

*of Chase Co.*, 42 Kan. 223, 224, 21 P. 1071 (1889) ("Inherently the supreme court must have the power to protect its own jurisdiction, its own process, its own proceedings, its own orders, and its own judgments."). Without the inherent power to impose remedies and otherwise enforce our holdings, our power to review would be virtually meaningless. See *Kjellander v. Kjellander*, 90 Kan. 112, 114, 132 P. 1170 (1913) ("The appellate jurisdiction conferred carries with it, by implication, the power to protect that jurisdiction and to make the decisions of the court thereunder effective.").

Supreme courts in our sister states have also recognized this power to review funding systems for constitutionality and order remedies in their own school finance cases. See *Londonderry School District SAU No. 12 v. State*, 154 N.H. 153, 163, 907 A.2d 988 (2006) ("[T]he judiciary has a responsibility to ensure that constitutional rights not be hollowed out and, in the absence of action by other branches, a judicial remedy is not only appropriate but essential."). As the Ohio Supreme Court stated:

> "The legislature has the power to draft legislation, and the court has the power to determine whether that legislation complies with the Constitution. However, while it is for the General Assembly to legislate a remedy, courts *do* possess the authority to enforce their orders, *since the power to declare a particular law or enactment unconstitutional must include the power to require a revision of that enactment, to ensure that it is then constitutional. If it did not, then the power to find a particular Act unconstitutional would be a nullity. As a result there would be no enforceable remedy. A remedy that is never enforced is truly not a remedy*." (Emphasis added.) *DeRolph v. State*, 89 Ohio St. 3d 1, 12, 728 N.E.2d 993 (2000) (*DeRolph II*).

See also *Campbell County School Dist. v. State*, 907 P.2d 1238, 1264 (Wyo. 1995), *as clarified on denial of reh'g* (Dec. 6, 1995) (*Campbell I*) ("Constitutional provisions imposing an affirmative mandatory duty upon the legislature are judicially enforceable in protecting individual rights, such as educational rights . . . . When the legislature's

68

transgression is a failure to act, our duty to protect individual rights includes compelling legislative action required by the constitution."); *Robinson v. Cahill*, 67 N.J. 333, 344, 339 A.2d 193 (1975) (If a right to education exists, "it follows that the court must 'afford an appropriate remedy to redress a violation of those rights. To find otherwise would be to say that our Constitution embodies rights in a vacuum, existing only on paper.'").

The Wyoming Supreme Court provided a thorough explanation of this remedial power in *State v. Campbell County School Dist.*, 2001 WY 90, ¶¶ 32-33, 32 P.3d 325 (2001) (*Campbell III*):

"While we recognize the legislative and executive branches of Wyoming's state government have broad powers and responsibilities in providing the fundamental right of an education to our children, the powers of each branch of government are bound by the mandates and the constraints of the Wyoming Constitution. '*If the executive and legislative branches fail to fulfill their duties in a constitutional manner, the Court too must accept its continuing constitutional responsibility . . . for overview . . . of compliance with the constitutional imperative*.' *Unfulfilled Promises: School Finance Remedies and State Courts*, 104 Harv. L. Rev. 1088 (1991).

". . . The legislature's failure to create a timely remedy consistent with constitutional standards justifies the use of provisional remedies or other equitable powers intended to spur action. *Unfulfilled Promises: School Finance Remedies and State Courts*, 104 Harv. L. Rev. 1086. When insufficient action in the legislative process occurs, judicial monitoring in the remediation phase can help check political process defects and ensure that meaningful relief effectuates the court's decision. *Id.* at 1087. When these defects lead to continued constitutional violations, judicial action is entirely consistent with separation of powers principles and the judicial role.

"'An active judicial role in monitoring remedy formulation is well-rooted in the courts' equitable powers.' . . . [*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S. Ct. 1267, 28 L. Ed. 2d 554 (1971)]. How long a court waits and the degree of intervention

exercised will depend upon the facts, such assessments fall squarely within the court's expertise. *But staying the judicial hand in the face of continued violation of constitutional rights makes the courts vulnerable to becoming complicit actors in the deprivation of those rights. Id.*" (Emphasis added.)

Before providing this explanation, the Wyoming Supreme Court in 2001, like the Kansas Supreme Court in *Atkinson* nearly 100 years earlier, quoted extensively with approval from Alexander Hamilton's Federalist Paper No. 78. See *Campbell III*, 2001 WY 90, ¶¶ 30-33. Hamilton's language and rationale led the Wyoming court to conclude:

"Our school finance decisions are the natural result of our understanding and application of the immutable truths of which Hamilton spoke. . . . Where the will of the legislature declared in its school finance statutes stands in opposition to the will of the people declared in their Wyoming Constitution, we are, and must be, governed by the will of the people." 2001 WY 90, ¶ 31.

The legislature is not only required to submit to the will of the people in the area of school finance but also in the area of legislative reapportionment. And the federal district courts in Kansas have exercised their inherent remedial powers to redraw legislative districts when the state legislature has failed to do so. See, *e.g.*, *Essex v. Kobach*, 874 F. Supp. 2d 1069 (D. Kan. 2012); *O'Sullivan v. Brier*, 540 F. Supp. 1200 (D. Kan. 1982). In *Essex*, a panel of three federal judges observed that the Kansas Legislature had failed to meet its duty to adopt new apportionment maps after the 2010 census, *i.e.*, that it had failed to meet its duty under the federal and state constitutions. 874 F. Supp. 2d at 1073. Suit was filed claiming the districts created after the 2000 census had become unconstitutional due to population shifts and asking that the secretary of state be enjoined from conducting the 2012 elections using the existing maps.

70

After agreeing that the existing maps were unconstitutional, the three-judge panel in *Essex* focused on remedies. It acknowledged its remedial powers as a court in equity, stating these powers are "broad" but "limited 'to remedies required by the nature and scope of the violation.'" See 874 F. Supp. 2d at 1084 (citing *White v. Weiser*, 412 U.S. 783, 793, 93 S. Ct. 2348, 37 L. Ed. 2d 335 [1973]). Pursuant to its powers, the panel ordered that the State adopt a congressional redistricting plan that a party had submitted and the panel had modified. 874 F. Supp. 2d at 1086. As for redistricting the state senate, house of representatives, and board of education as required by the Kansas state constitution, the panel created its own maps, which it ordered the State to adopt. 874 F. Supp. 2d at 1091, 1094. There were no challenges to the authority of the *Essex* panel nor to the scope of its equitable remedies forcing the State to comply with the federal and state constitutions. See 874 F. Supp. 2d 1069; *O'Sullivan*, 540 F. Supp. 1200 (same).

### *Actual remedies*

The panel in this case clearly was relying upon its inherent remedial powers as an equitable court when it entered orders striking the 2015 legislature's amendments to the school funding system, reviving parts of the prior one, and ordering payment of aid. But, while we are affirming the panel's holdings by declaring that S.B. 7 fails to cure the inequities affirmed to exist in *Gannon I*, a majority of the court agrees with the State that the legislature should be given another, albeit shortened, opportunity to develop a constitutional school funding system. Accordingly, in anticipation of legislative action which will likely moot our enforcement of the panel's specific equity orders, we decline to affirm those orders or address the parties' specific arguments as to their propriety. See *Gannon v. State*, 298 Kan. 1107, 1157, 319 P.3d 1196 (2014) (*Gannon I*) (because court declined to adopt panel's remedy, no need to address State's argument that remedy violated separation of powers doctrine). We also decline to issue any ruling on the panel's declaratory judgment regarding adequacy since that issue is not before us at this time.

Consequently, our order of June 30, 2015, staying the panel's order remains in effect until further determination by this court.

We also stay the issuance of today's mandate to give the legislature a second, and substantial, opportunity to craft a constitutionally suitable solution and minimize the threat of disruptions in funding for education. This stay is consistent with much of the history of school finance litigation in this state. See, *e.g.*, *Gannon I*, 298 Kan. at 1198-99 (remanding to panel for enforcement of affirmed equity rulings and allowing legislature a reasonable time—approximately 110 days—to cure the constitutional deficiencies before the panel took action); *State v. Montoy*, 278 Kan. 769, 775-76, 120 P.3d 306 (2005) (*Montoy II*) (retaining jurisdiction and staying all further proceedings to allow the legislature a reasonable time—approximately 90 days—to correct the constitutional infirmity the court identified in the financing formula); see also *Knowles v. State Board of Education* (Chautauqua County District Court January 6, 1975) (finding School District Equalization Act unconstitutional but staying enforcement of injunction until beginning of next fiscal year to give legislature time to act); *Caldwell v. State*, No. 50,616 (Johnson County District Court August 30, 1972) (finding School Foundation Fund Act unconstitutional but staying enforcement of injunction until beginning of next fiscal year to give legislature time to act).

Granting the legislature further opportunity to cure is also consistent with school finance litigation in other states. See, *e.g.*, *Neeley v. W. Orange-Cove Consol. Indep. Schl. Dist.*, 176 S.W.3d 746, 799 (Tex. 2005) (affirming district court injunctions prohibiting state officials from funding state's school system until legislature conformed the system to the requirements of the constitution but staying them until a date certain to give legislature time to remedy affirmed constitutional violations; after legislature was unable to remediate, supreme court postponed injunction's effective date to allow legislature more time to remediate); *Edgewood Independent School Dist. v. Kirby*, 804

S.W.2d 491, 498 (Tex. 1991) (*Edgewood II*) (after remedial legislation again failed to conform to the constitutional requirements, court enjoined funding state's school system but again stayed injunction to give legislature additional time to remedy violations); *DeRolph v. State*, 93 Ohio St. 3d 309, 754 N.E.2d 1184 (2001) (*DeRolph III*) (after court found school finance law unconstitutional, General Assembly enacted legislation, which court again found unconstitutional; court granted General Assembly additional time to bring law into constitutional compliance, which court ultimately approved after modification); see also, *e.g.*, *Claremont School Dist. v. Governor*, 142 N.H. 462, 476, 703 A.2d 1353 (1997) (holding school funding system unconstitutional and staying "all further proceedings until the end of the upcoming legislative session and further order of this court to permit the legislature to address the issues involved in this case"); *Helena Elementary School Dist. No. 1 v. State*, 236 Mont. 44, 59, 769 P.2d 684 (1989) (after court held state school funding system unconstitutional, ruling held in abeyance for 5 months "in order to provide the Legislature with the opportunity to search for and present an equitable system of school financing").

With this backdrop established, we repeat that during this additional time accorded the 2016 legislature, constitutional infirmities "can be cured in a variety of ways—at the choice of the legislature." 298 Kan. at 1181, 1188-89. One obvious way the legislature could comply with Article 6 would be to revive the relevant portions of the previous school funding system and fully fund them within the current block grant system. See 298 Kan. at 1198 (if by July 1, 2014, the legislature had fully funded the capital outlay and the supplemental general state aid provisions—without proration—the panel need not have taken any enforcement action). The legislature's voluntary revival of these statutory provisions and funding consistent with them is certainly not the only path to compliance. But if the legislature rejects this solution, any other funding system it enacts must be demonstrated to be capable of meeting the equity requirements of Article 6—while not running afoul of the adequacy requirement. 298 Kan. at 1200 (explaining that although

adequacy and equity are distinct components of Article 6, they do not exist in isolation from each other, so that a particular cure of equity infirmities may affect adequacy of the funding system). Speaking more plainly, the State would help its case by showing its work in how it determined that any other proposed solution complies with *Gannon I*.

In short, if by the close of fiscal year 2016, ending June 30, the State is unable to satisfactorily demonstrate to this court that the legislature has complied with the will of the people as expressed in Article 6 of their constitution through additional remedial legislation or otherwise, then a lifting of the stay of today's mandate will mean no constitutionally valid school finance system exists through which funds for fiscal year 2017 can lawfully be raised, distributed, or spent.

This concept of statutory invalidity is not new. More than 100 years ago a Kansas appellate court held that a county commission was not authorized to levy taxes under a legislative enactment previously declared unconstitutional because "'[a]n unconstitutional act is not a law. It confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed.'" *Wyandotte Co. v. K.C., F.S. & M. Rld. Co.*, 5 Kan. App. 43, 44, 47 P. 326 (1896) (quoting *Norton v. Shelby Cty.*, 118 U.S. 425, 6 S. Ct. 1121, 30 L. Ed. 178 [1886]). See *State ex rel. Stephan v. Thiessen*, 228 Kan. 136, 143-44, 612 P.2d 172 (1980) (holding statute enacted in bill that contained more than one subject in violation of Kan. Const. art. 2, § 16 was "invalid in its entirety" and district court therefore erred in issuing writ of mandamus compelling compliance with statute); *cf. Lake View School Dist. No. 25 of Phillips County v. Huckabee*, 351 Ark. 31, 97, 91 S.W.3d 472 (2002) ("Clearly, the public schools of this state cannot operate under this constitutional cloud. Were we not to stay our mandate in this case, every dollar spent on public education in Arkansas would be constitutionally suspect.").

74

Without a constitutionally equitable school finance system, the schools in Kansas will be unable to operate beyond June 30. And because an unconstitutional system is invalid, efforts to implement it can be enjoined. See *Gannon I*, 298 Kan. at 1199 (if on remand the legislative cure fails the test for constitutional equity, "the panel should enjoin [its] operation").

The legislature's unsuccessful attempts to equitably, *i.e.*, fairly, allocate resources among the school districts not only creates uncertainty in planning the 2016-2017 school year but also has the potential to interrupt the operation of Kansas' public schools. We desire to avoid this uncertainty, and like the Texas Supreme Court we "desire to avoid disruption of the educational process." *Edgewood Independent School Dist. v. Kirby*, 804 S.W.2d 491, 498 (Tex. 1991) (*Edgewood II*). But like that court, we too must heed our duty to ensure Kansas students receive the education system guaranteed them by the Constitution. "If the educational process is to be disrupted, it will be because the demands of the Constitution cannot be further postponed." 804 S.W. 2d at 498.

Accordingly, the legislature's chosen path during the 2016 session will ultimately determine whether Kansas students will be treated fairly and the schoolhouse doors will be open to them in August for the beginning of the 2016-2017 school year. The legislature's choices will also dictate whether we may proceed to the final stage of this litigation, *i.e.*, the sooner the legislature establishes a constitutional funding system, the sooner this case can be dismissed.

Reaching constitutional compliance by the end of June 30 is definitely achievable by the legislature, as it demonstrated in 2014. At that time the legislature showed its commitment and capability by passing remedial legislation within mere weeks of our

75

*Gannon I* decision—to the constitutional satisfaction of the panel applying our equity test. We are confident the legislature can do so again.

Our order should not be misinterpreted as expressing a desire by this court to become a regular supervisor of Kansas' school funding system. We do not, as evidenced by our dismissal of the *Montoy* litigation 10 years ago. See *State v. Montoy*, 282 Kan. 9, 138 P.3d 755 (2006) (*Montoy IV*); see also *Gannon I*, 298 Kan. at 1115 (noting this court's denial of *Montoy* plaintiffs' motion in 2010 to reopen their appeal and remand the case to the district court to determine whether [1] the current Kansas school finance funding system was constitutional and [2] funding cuts since the dismissal of the *Montoy* case were made in violation of Article 6, state law, or our mandates in *Montoy*). We are also mindful of the criticisms in some academic circles that judicial remedies in school finance cases may be ineffective, especially as they concern improving student outcomes. See generally, Hanushek & Lindseth, *Schoolhouses, Courthouses, and Statehouses*, (Princeton University Press 2009).

But our order is a manifestation of Hamilton's conclusion that "the courts were designed to be an intermediate body between the people and the legislature." Federalist Paper No. 78. Consequently, while we do not desire to become a supervisor of the school finance system, neither do we abandon our duty to the people of Kansas under their constitution to review the legislature's enactments and to ensure its compliance with its own duty under Article 6. See *Gannon I*, 298 Kan. at 1159 ("'[T]he judiciary's sworn duty includes judicial review of legislation for constitutional infirmity.'"); see also *Harris v. Shanahan*, 192 Kan. 183, 206, 387 P.2d 771 (1963) (court has "obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people"). And however delicate our sworn duty may be, "we are not at liberty to surrender, or to ignore, or to waive it." See 192 Kan. at 207.

We retain jurisdiction over the State's appeal and stay the issuance of today's mandate through June 30, 2016. We stay the adequacy portion of the appeal.

Affirmed in part and reversed in part.

BEIER and STEGALL, JJ., not participating.

MICHAEL J. MALONE, Senior Judge, and DAVID L. STUTZMAN, District Judge, assigned.[1]

* * * *

JOHNSON, J., concurring in part, dissenting in part:  I generally agree with the majority's holdings except for its refusal to affirm and enforce the district court panel's remedy. The panel did exactly what we instructed it to do. The remedy it fashioned was timely, not "premature." Consequently, this court should not have issued a stay on June 30, 2015, and we should not refuse to enforce the panel's orders now.

This case required a panel of three district court judges—either active or retired—because of the enactment of K.S.A. 72-64b03 in 2005. L. 2005, ch. 194, sec. 22. The provision is specifically and solely applicable when "a petition is filed in a district court of this state alleging a violation of article 6 of the Kansas constitution," *i.e.*, a school

---

[1]**REPORTER'S NOTE:**  District Judge Stutzman was appointed to hear case No. 113,267 vice Justice Beier under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution, and Senior Judge Malone was appointed to hear the same case under the authority of the Supreme Court by K.S.A. 20-2616.

finance case. K.S.A. 2015 Supp. 72-64b03(a). We need not speculate as to whether the timing of the enactment had anything to do with prior school finance rulings because the Kansas Attorney General at that time specifically mentioned *Montoy* while testifying in favor of the bill. The attorney general opined that a three-judge panel would be "more contemplative and more representative in its interpretation of the Constitution." Minutes of Senate Judiciary Committee hearing on Senate Bill 181, February 17, 2005.

The panel in this case can certainly be characterized as "representative" of the district court bench in this state. The citizens of the 15th Judicial District in far northwest Kansas elected Judge Jack L. Burr to be their district judge for over 30 years, until his retirement in 2009, at which point he assumed senior judge responsibilities. Judge Robert J. Fleming is a long-serving district judge in the 11th Judicial District in the far southeast corner of our State and has volunteered to serve the Judicial Branch in many capacities, including the Kansas Commission on Judicial Qualifications. Judge Franklin R. Theis, currently the state's longest-serving district judge, is in his fourth decade on the Shawnee County bench—the Third Judicial District—and has presided over many complex and high-profile cases. I submit that the Chief Judge of the Kansas Court of Appeals, who appointed the panel pursuant to K.S.A. 2015 Supp. 72-64b03(b), could not have assembled a "more contemplative and [] representative" group.

The attorney general's office also testified before the House Select Committee on School Finance in 2005, urging the adoption of the unique procedure for school finance cases. An assistant attorney general rationalized that "[t]he anticipated positive impacts of [the] proposed change in [the] law would be to aid in both the thoroughness and objectivity in the handling of the case at the district court level, while also expediting the appeal process of these important cases should an appeal be taken." Minutes of the House Select Committee on School Finance on Senate Bill No. 181, March 14, 2005, Attachment 2-1.

Interestingly, not everyone was convinced of the altruistic motive behind the legislation. Kathy Cook, Executive Director of the Kansas Families United for Public Education, told the committee that the "bill is not about judicial scrutiny, . . . not about fairness, . . . not about insuring students and parents' rights under the Constitution, because it only impedes the process." Minutes of the House Select Committee on School Finance on Senate Bill No. 181, March 14, 2005, Attachment 1. Ironically, the current attorney general now urges this court to accord no deference to the system for which his predecessor successfully lobbied.

Nevertheless, the new procedure for school finance cases has been dutifully followed at all levels of the Judicial Branch. This court fully embraced the procedure in *Gannon I* when we remanded the equity component of this action with instructions for the panel to "*enforce* these affirmed equity rulings." (Emphasis added.) *Gannon v. State*, 298 Kan. 1107, 1198, 319 P.3d 1196 (2014). Specifically, we said that, if the legislature attempts to cure the inequities in the system by some means other than fully funding the previously existing provisions, then the panel was to assess the attempted cure through the lens of our articulated test.

But we did not merely ask the panel to provide a declaratory judgment on the legislature's compliance with our equity rulings, so that we could later fashion our own enforcement remedy. We specifically instructed the panel to remedy the inequities. With respect to the capital outlay provision, we directed: "If the legislative cure fails this test, the panel should enjoin its operation and enter such orders as the panel deems appropriate." 298 Kan. at 1198. With respect to the local option budget and supplemental general state aid, we directed: "If the panel then determines those inequities are not cured, it should enjoin operation of the local option budget funding mechanism, K.S.A.

79

2013 Supp. 72-6433 and 72-6434, or enter such other orders as it deems appropriate." 298 Kan. at 1199.

And the panel followed our instructions to the letter. It thoroughly analyzed each provision of the legislature's proposed "fix"; objectively determined which portions could be constitutionally salvaged and which ones needed to be deleted or modified to preserve the constitutional integrity of the enactment; and "enter[ed] such orders as the panel deem[ed] appropriate." 298 Kan. at 1198. In other words, the panel used its discretionary powers to enforce our equity rulings, as we told it to do. Moreover, there is precedent to support the remedy it fashioned. See, *e.g.*, *DeRolph v. State*, 93 Ohio St. 3d 309, 754 N.E.2d 1184 (2001) (modifying remedial legislation enacted following the court's holding that the state's school financing scheme violated the Ohio Constitution's education clause and ordering the state to implement the court's changes and fully fund them by a date certain); *State v. Campbell County School Dist.*, 2001 WY 90, ¶¶ 17-20, 32 P.3d 325 (2001) (ordering specific amount of funding for school district capital construction projects to cure constitutional violations); *cf. Montoy v. State*, 279 Kan. 817, 844-45, 112 P.3d 923 (2005) (in response to State's request for a year delay to conduct additional cost study, court ordered added funding of $285 million, which was one-third of estimated funding to achieve constitutional compliance).

If a reasonable person could agree with the trial court's exercise of discretion, "[i]t matters not a whit whether an appellate jurist might have made a different decision." *State v. Moyer*, 302 Kan. 892, 903, 360 P.3d 384 (2015). In that vein, the majority should not substitute its own preferred remedy for that ordered by the panel.

In short, I would affirm the panel's rulings on the equity portion of this lawsuit, with such supplementation as may be necessary for fiscal years 2016 and 2017.